(No. 6408. July 22, 1937.)

NELLIE I. GEIST and NELLIE I. GEIST, as Guardian
*Ad Litem* for CLYDE GEIST, JUNE GEIST and
MARIAN GEIST, Minors, Respondents, v. F. J.
MOORE and MARY McKINNIS, Appellants.

[70 Pac. (2d) 403.]

Wm. S. Hawkins and Robert E. Brown, for Appellants.

Whitla & Knudson, for Respondents.

J. F. Martin, *Amicus Curiae.*

GIVENS, J.—Returning to their homes in Kellogg from Spokane, F. J. Moore driving an automobile with the owner, Mrs. Mary McKinnis, and Mrs. Mary Furnish, a guest, at 25–30 miles per hour in an easterly direction through intermittent fog, on the unobstructed "Yellowstone Trail" U. S. Highway No. 10, 2–3 miles west of Coeur d'Alene near the bottom of a slight declivity, at about 9 P. M. November 29th, 1935, struck Kimball Geist.

The testimony of the above parties, the only eye-witnesses to the accident, was in substance that Geist walking erratically on the highway about two feet south of the center line stripe thereof, waving his hands, suddenly loomed up 10–20 feet in front of the automobile which with brakes quickly applied was turned sharply to the left in an attempt to avoid hitting deceased, who was struck and knocked or thrown so his body was partly on the edge of the highway and his legs somewhat on the shoulder of the highway toward the borrow-pit or ditch on the right-hand side of the way the car was going, about 15 feet from where the car stopped diagonally across the road.

He was immediately given first aid by Moore, Mrs. Furnish, Mrs. McKinnis, who was a trained nurse, and others who happened upon the scene, attempting to stop the flow of blood from his injuries, and was taken to a hospital in Coeur d'Alene where Doctors Husted and Krotcher treated him, and described his injuries as a badly mashed leg, broken below the knee, the flesh open and a gash about ten inches long in which were particles of torn cloth and which bled considerably, a wound in the other leg, a fracture of the femur and other fractures of the thigh of this leg, suffering from shock and embolism in the pulmonary artery continuing until he died December 1st, three days after the accident.

Geist's widow in her own right and as guardian of her minor children sued Moore and Mrs. McKinnis.

Appellants appealed from the judgment entered May 19, 1936, against them for $25,000 entered immediately upon the rendition of the verdict of like amount; from orders denying, the motion for a new trial, and motion for judgment notwithstanding the verdict; and from the judgment entered August

10, 1936, after the court had provisionally denied the motion for a new trial, upon condition that plaintiffs would remit all that part of the previous judgment in excess of $10,000, which plaintiffs did.

The undertaking on appeal recited that appellants appealed to the court from the two judgments and two orders, but used the singular in the obligation thus:

" . . . . and said defendants desire to give an undertaking on said appeal under I. C. A. Paragraphs 11–202 and 11–203 and correlated provisions of the laws of the State of Idaho for costs on said appeal; now, therefore,

"THIS INSTRUMENT EVIDENCES, that the undersigned surety and fidelity company, qualified as such under the laws of the State of Idaho, is hereby obligated to the plaintiffs herein, and each of the same, under said statutory obligations in the penal sum of Three Hundred ($300.00) Dollars."

Respondents moved to dismiss the appeal from the orders because the obligation part of the bond is not in the plural hence refers, it is contended, only to the last judgment, relying upon *Spokane Cattle Loan Co. v. Crane Creek Sheep Co.*, 36 Ida. 786, 213 Pac. 699. Therein, however, the undertaking on appeal in its entirety referred to but one judgment or order and herein in its entirety it refers to all four, therefore is governed by *Martin v. Wilson*, 24 Ida. 353, 134 Pac. 532; *Cupples v. Stanfield,* 35 Ida. 466, 207 Pac. 326; *Caldwell v. Village of Mountain Home,* 49 Ida. 32, 285 Pac. 1020; *Aumock v. Kilborn,* 52 Ida. 438, 16 Pac. (2d) 975, to the effect that the defect in the bond in question is one which must be taken advantage of within 20 days under I. C. A., sec. 11–203, or "such insufficiency or defect shall be deemed waived." No notice of any defect was so filed, and the motion to dismiss on this ground is denied. (See, also, *Walker Bank & Trust Co. v. Steely,* 54 Ida. 591, 34 Pac. (2d) 56.)

Respondents also move for diminution of the record to strike pages 7 to 40 inclusive of the reporter's transcript as improperly included; to dismiss the appeals from the orders for the same reasons, and that there is no certificate of the court in connection with papers used by him in connec-

tion with said motions and that certain affidavits were improperly in the reporter's transcript. No assignments of error are based upon these affidavits and therefore we need not further consider that feature.

■ There were certificates as to the papers used by the court on both orders and therefore while the scope of the appeal will be limited to a consideration of the papers used by the court, the appeals should not be dismissed.

■ There was an application for the reporter's transcript in compliance with I. C. A., sec. 7–509, an order signed by the court directed to the reporter, service acknowledged by the reporter, a *praecipe* to the clerk including the reporter's transcript, proper orders for extension of time for preparation of the transcript by the court, a certificate of the reporter to the correctness of the transcript, a certificate of the clerk as to the correctness of the transcript, and though there is no order by the court settling the transcript, there is an acknowledgment of service of the transcript by respondents on November 2, 1936, and no suggestion then or now that the transcript is incorrect as provided for in sec. 7–509, *supra*. The motion to dismiss the appeal will therefore be denied. (*Utana M. Corp. v. Salmon River P. & L. Co.*, 37 Ida. 793, 218 Pac. 789; *Keating v. McGivney*, 37 Ida. 797, 218 Pac. 791; *Williamson v. Wilson*, 55 Ida. 337, 42 Pac. (2d) 290.)

■■ The basis of objection made by counsel *amicus* and appellants to the action of the trial court in ordering a remission of the judgment to $10,000 to respondents under penalty of new trial is largely based upon a letter written by the court August 4, 1936:

"I am of the further opinion that the damages rendered in said case are excessive and unwarranted by the evidence and appear to have been given under the influence of prejudice. However, if the plaintiffs will remit that part of the judgment in excess of $10,000.00, the motion for new trial will be overruled. Plaintiffs may have until August 10th in which to remit all of that part of the judgment in excess of $10,000.00 and if, by that time, the same is not remitted a new trial will be granted."

outlining his ruling indicating he considered the verdict had been given under the influence of prejudice. The formal

order denying the motion for a new trial was however as follows:

"In this matter the defendants' motion for new trial having come regularly on for hearing, the defendants appeared with their attorneys Edge & Wilson and Wm. S. Hawkins and the plaintiffs were represented by their attorneys Whitla & Knudson. Thereupon said matters were argued and submitted and the Court on August 4th made a memorandum decision to the effect that the damages were excessive, but that the Motion for New Trial would be denied if the plaintiffs should remit that part of the judgment in excess of $10,000 and gives the plaintiffs until August 10th to file Notice of such remit herein, and the plaintiffs having heretofore duly filed in this Court notice that said judgment in excess of said sum would be remitted in accordance with the decision of this Court.

IT IS THEREFORE ORDERED that the defendants' motion for a new trial be, and the same hereby is overruled and denied."

wherein it will be noticed the court did not say the damages were due to prejudice but were merely excessive. The letter is not properly in the transcript and therefore is not binding on us in considering this question. (*North Robinson Dean Co. v. Strong*, 25 Ida. 721, 139 Pac. 847; *Corker v. Cowen*, 30 Ida. 213, 164 Pac. 85; *Baldwin v. Singer Sewing Mach. Co.*, 48 Ida. 596, 284 Pac. 1027.) Authorities cited by appellant and counsel *amicus* and others in the note[1] recognize

---

[1] *Ellis v. Ashton & St. Anthony Power Co.*, 41 Ida. 106, 238 Pac. 517; *Chester Park Co. v. Schulte*, 120 Ohio St. 273, 166 N. E. 186; *Schendel v. Bradford*, 106 Ohio St. 387, 140 N. E. 155; *World Oil Co. v. Hicks*, (Tex. Civ. App.) 75 S. W. (2d) 905; *Muskogee Electric Traction Co. et al. Hairel et al.*, 46 Okl. 409, 148 Pac. 1005; *Rhyne v. Turley*, 37 Okl. 159, 131 Pac. 695; *Tunnel Min. & Leasing Co. v. Cooper*, 50 Colo. 390, 115 Pac. 901, Ann. Cas. 1912, 504, 39 L. R. A., N. S., 1064; *Aherns v. Fenton*, 138 Iowa, 559, 115 N. W. 233; *Savannah F. & W. Ry. Co. v. Godkin*, 104 Ga. 655, 30 S. E. 378, 69 Am. St. 187; *Carpenter v. Village, of Dickey*, 26 N. D. 176, 143 N. W. 964; *Kohut v. Boguslavsky*, 78 Colo. 95, 239 Pac. 876; *Gila Valley G. & N. R. Co. v. Hall*, 13 Ariz. 270, 112 Pac. 845; *Yard v. Gibbons*, 95 Kan. 802, 149 Pac. 422; *Rafferty v. Public Service etc. Co.*, 13 N. J. Misc. 80, 177 Atl. 357; *Cotton v. Ship-*

that if the verdict is excessive the trial court may order an alternative remission: such ruling being in harmony with the previous decisions of this court; *Keim v. Gilmore & Pittsburg R.R. Co.*, 23 Ida. 511, at 523, 131 Pac. 656; *Denbeigh v. Oregon-Washington etc. Co.*, 23 Ida. 663 at 684, 132 Pac. 112; *Barter v. Stewart Min. Co.*, 24 Ida. 540, at 547, 135 Pac. 68; *McAlinden v. St. Maries Hospital Assn.*, 28 Ida. 657 at 681, 156 Pac. 115; *Kinzell v. Chicago etc. Ry. Co.*, 33 Ida. 1 at 20, 190 Pac. 255; *Roy v. Oregon Short Line R. R. Co.*, 55 Ida. 404, 42 Pac. (2d) 476, distinguishing *Reinhold v. Spencer*, 53 Ida. 688, 700, 26 Pac. (2d) 796 thus:

"Counsel for respondent rely chiefly on the case of *Reinhold v. Spencer*, 53 Ida. 688, 700, 26 Pac. (2d) 796, in support of their contention that this court has no power to reduce the judgment, on the ground of the verdict being excessive. In that case this court said:

" 'Coming to the question of damages, which appellant urges are excessive, we know of no rule that will enable us to reduce the damages .... it is solely for the jury to estimate them as best they can by reasonable probabilities, based upon their sound judgment as to what would be just and proper under all of the circumstances, which may not be disturbed in the absence of some showing that the jury were biased or prejudiced or arrived at the amount in some irregular manner.'

"As may be observed from an examination of the Reinhold case, it involved an unusual and peculiar state of fact, out of which a permanent injury arose, continuing in the element of pain and suffering. The statement above quoted was made with special reference to the facts and circumstances as disclosed in that particular case and was not intended in any way to overrule or modify the long-established practice of this

*By-Truck Co.*, 337 Mo. 270, 85 S. W. (2d) 80; *Minneapolis, etc., v. Noah Moquin*, 283 U. S. 520–522, 51 Sup. Ct. 501, 75 L. ed. 1243; *Smith v. Martin*, 93 Vt. 111, 106 Atl. 666; *Arkansas Val. Land & Cattle Co. v. Mann*, 130 U. S. 69, 9 Sup. Ct. 458, 32 L. ed. 854; *Leinbach v. Pickwick Greyhound Lines, Inc.*, 135 Kan. 40, 10 Pac. (2d) 33; *Henderson v. Dreyfus*, 26 N. M. 541, 191 Pac. 442; *Adcock v. Oregon R. & Nav. Co.*, 45 Or. 173, 77 Pac. 78; *McAfee v. Ogden Union Ry. & Depot Co.*, 62 Utah, 115, 218 Pac. 98.

court in its exercise of the power to modify and reduce a judgment, because of the excessive amount allowed by the verdict of the jury. An examination of the cases cited in support of the above-quoted statement will disclose that in all those cases this court held that the verdicts were not in fact excessive. . . . . ''

Even though we consider the letter *supra,* the situation is almost identical with the action of this court in *Kinzell v. Chicago etc. Ry. Co., supra,* where the court in the original majority opinion stated:

''The exhibition of respondent's person at the close of the trial was of a nature to strongly excite the sympathies of the jury, and we conclude that the amount of the verdict was in part the result of passion and prejudice. . . . . ''

Therein a petition for rehearing was filed, among other things contending that:

''That upon the findings of this court in its opinion *on the question of excessive damages,* it should have *reversed the judgment* and ordered a new trial instead of reducing the judgment and it appears that the Court, either inadvertently or by oversight, failed to note, point out and so hold that this is a case in which the *verdict was tainted by passion, prejudice and bias and should be reversed in toto,* and was not a verdict in which an impartial and unbiased jury had obviously committed error in calculation of computation.''

arguing in connection therewith that:

''As we understand the trend of the American authorities it seems to us that this court, upon its own findings and reasoning as contained in the opinion with reference to the excessive character of the verdict and its being tainted with passion and prejudice, should have reversed the judgment and remanded the case for a new trial instead of reducing and modifying it. Perhaps this action of the Court was taken without having its attention called to the distinction between that class of cases where the court will reduce a verdict for damages when it is apparent that the error has occurred through a miscalculation of the jury or a misconception by it of the basis on which the calculation should be made, and that other class of cases where the only apparent

reason for the excessive character of the verdict is that it was the result of bias, prejudice or passion. This case clearly falls within the latter class as is indicated by the court in the opinion. The distinction which we have above stated is very clearly and succinctly set forth by the Supreme Court of Montana in *Chenoweth v. Great Northern Ry. Co.*, 50 Mont. 481, 148 Pac. 330, wherein the court says:

" 'In addition to the remedy by new trial, there is available to the defeated party the right to insist that the amount of the verdict be reduced by the court. This principle has become so firmly established in the jurisprudence of our country that it may well be said to be a part of the American common law. It is a serious question whether a court should ever resort to this latter remedy, except in a case where the amount of the excess can be accounted for by resort to mathematical calculation, based upon some error in the standard adopted by the jury. *If the amount of the excess cannot be ascertained by some rational method other than the mere ipse dixit of the court, a new trial should be granted,* for under our judicial system the rights of parties are submitted to the *fair and impartial judgment of jurors, not to their passions or prejudices. Whenever it becomes apparent that either or both of these impulses influenced the amount of a verdict, it is the duty of the court to see that a tribunal created to secure justice is not perverted from its purpose and made an implement of oppression.*' "

Thus substantially the same point now urged was urged there with regard to the statement therein that the verdict was based on prejudice as the trial court indicated herein in his letter, but the entire court denied the petition for rehearing in this language:

"Upon petition for rehearing our attention has been called to the statement in the original opinion 'that the *amount* of the verdict was in part the result of passion and prejudice.'

"Since the meaning we intended to convey has been apparently misunderstood, we desire to add that although we cannot say that the rendition of the verdict in favor of respondent was the result of passion or prejudice, his condition, observed by the jury during the exhibition of his person at the

close of the trial, was such as naturally to strongly excite the sympathies of the jury, and the verdict was doubtless augmented as a result thereof.''

But counsel argue that the record herein shows that passion or prejudice entered into the jury's deliberations not only as to the amount of the verdict but as contributing to their returning any verdict at all against appellants, hence the entire verdict is vitiated and the only constitutional protection is to have a new trial granted.

The affidavit of one of respondents' counsel in opposition to appellants' motion for a new trial and motion for judgment notwithstanding the verdict states:

''That I was present in the Court Room of the above entitled Court on May 19, 1936, when the above entitled case was being argued to the jury, when Lester P. Edge, one of the attorneys for the defendants residing at Spokane, Washington, was arguing this case before the jury, he stated to the jury in substance that if they found in favor of the plaintiff they might just as well give the plaintiffs all that they asked for, as they were entitled to that if they were entitled to anything. During said argument he called attention to the fact that the plaintiffs asked for over $35,000 and also called attention to the fact that if the jury believed he was earning what they claimed of $150.00 per month, it would entitle them to that sized verdict if entitled to anything. Affiant made particular note of that fact at that time.''

which is not denied, thus appellant invited the amount of the verdict and we are not prepared to say the amount of the original verdict was excessive or so excessive as to show prejudice, either as to the amount thereof or its rendition. Deceased left a widow, three minor children, was about 40 years of age, with earning capacity of $150 per month, a life expectancy of 29.3 years, capable of thus earning $43,500. In addition to this there was loss of companionship of a father and husband, so even though the memorandum decision be considered, the undisputed facts in the case, that is, the man's death and the lack of anything transpiring to show passion or prejudice aside from the amount of the verdict, does not justify the conclusion that it was based on passion or prejudice.

█ Furthermore in connection with the above point, appellants' assignment of error that the evidence is insufficient to sustain the burden of proof resting upon respondents to show by a preponderance of the evidence that appellants were guilty of negligence and concomitantly urged error in the trial court's refusal to grant a new trial because of such lack of evidence will be sufficiently dissipated by the discussion of the evidence in connection with the other assignments without further special consideration.

Appellants claim instruction No. 4[1] was erroneous for the reason "that the question of headlights was not in dispute and new matter was thus injected by the trial court for the consideration and speculation of the jury."

The allegations of negligence in the complaint are general but were substantially that appellants by the exercise of ordinary care and diligence should have and would have discovered deceased when he was at least 150 feet away and their headlights would have shown him in plain view at such time, that appellants had the last clear chance of preventing and avoiding said accident but did not stop said automobile or turn said automobile beyond the center line of said highway as it was their duty so to do.

Moore testified visibility was good at the time and place of the accident; Mrs. Furnish that it was hazy; Mrs. McKinnis that they had just emerged from a wall of fog. Others testified that along the highway near the scene of the accident there were alternative areas of fog and clear visibility. The question of headlights was first brought into the case on the direct examination of appellant Moore by his counsel:

"Q. Now, by the way, were your lights burning on the automobile?

---

"INSTRUCTION No. 4.

"1 Every vehicle upon a highway in this State from one half hour after sunset to one half hour before sunrise, and at any other time when there is not sufficient light to render clearly discernible any person on the highway at a distance of two hundred feet shall be equipped with two head lights so constructed, arranged and adjusted, that they will at all the time before mentioned and under normal atmosphere conditions and on a level road produce a driving light sufficient to render clearly discernible a person two hundred feet ahead."

"A. Yes, sir.

"Q. And were they in good working order?

"A. I would say they were, yes."

and Mrs. McKinnis:

"Q. How were your lights on your car, burning?

"A. Oh, yes—yes, they were." .

and on cross-examination of Mrs. Furnish without objection:

"Q. Always a mist. As you were driving in that evening, your lights furnished you plenty of visibility so that you felt safe on going out and at the speed you were going?

"A. Except for fog.

"Q. The lights were sufficient ahead so that you felt you were safe in travelling at the speed you were going?

"A. Yes, at the speed we were going."

Appellants and Mrs. Furnish testified they were driving practically on the center line or stripe of the highway and it was remarked what an assistance the yellow line was because of lack of visibility, and that they did not see the deceased until he was approximately 20 feet in front of the car.

The statute as contained in the instruction requires that headlights in normal atmospheric conditions be capable of affording vision for 200 feet. The jury was justified in believing that deceased may have come onto the highway more than 20 feet from the scene of the accident and they were justified in concluding appellants were guilty of negligence because of any or all of the following probabilities: i.e., either a careful lookout was not kept by the driver or there was fog which Moore and Mrs. McKinnis said there was not, necessitating more care and caution, or that the lights were not efficient or that the speed was too great to allow the car to be stopped within a safe distance of visibility considering the condition of the atmosphere and the declivity. The instruction is taken substantially from I. C. A., secs. 48–545 (a) and 48–547 (a) and in view of the above allegations, testimony and other statutory rules of the road contained in instructions Nos. 3 and 5, it was not improper for the court to give the instruction (*Ranstrom v. Oregon Short Line R. Co.*, 18 Fed. Supp. 256 at 258), and appellants cite no authorities to the contrary.

Appellants contend instructions Nos. 5 and 7 were erroneous because reasonable minds could not differ as to whether deceased was intoxicated and the instructions placed a burden of care upon appellants greater than that exacted by the law in the light of the evidence which they claimed showed deceased was walking upon the highway in an intoxicated condition. The appellants and Mrs. Furnish testified they detected the odor of liquor on deceased's breath immediately after he was knocked down. Hawley, driving a bus from Spokane to Coeur d'Alene observed a man, staggering on the bridge southeast of where the accident occurred, at the foot of the declivity, whom appellants contend by similarity of clothing was deceased. Haidle testified he saw deceased at the "Green Lantern," a refreshment place, about 7 o'clock in the evening and that he was "getting under the influence of liquor at that time." Mrs. Toth testified as to the clothing Mr. Geist had on and its condition, that he was in her lunch-room about 8 o'clock of the evening of the accident and was "very well intoxicated." Hargis passed a man about 500 feet southeast of the bridge above referred to about 25 minutes before the accident (he later was at the scene of the accident and helped to take deceased to the hospital) described his clothing as similar to that worn by deceased, and that the man was bent over and paid no attention to the lights of the car when he passed. He did not testify from his contract with Geist when he was taken to the hospital as to intoxication. His companion Hudson testified Geist did not pay any attention to their lights as they passed.

In conflict with this was the testimony of Mrs. Ott, the nurse at the hospital and Doctors Husted and Krotcher that they were necessarily in close proximity to deceased and paid close attention to him and detected no evidence that Geist was under the influence of liquor.

It was for the jury therefore to determine whether he was intoxicated and if so to what extent and whether he was so intoxicated as to be guilty of contributory negligence.

The appellants have cited no authority to the effect that it is a crime or illegal for an intoxicated person to be walking on a public highway at night nor has our attention been called to such a statute or rule of law. I. C. A., sec. 18–218, was

repealed by the 1935 Sess. Laws, chap. 103, sec. 90, p. 252. This accident occurred November 29, 1935, after the repeal of said act.

 Intoxication does not of itself constitute contributory negligence, 45 C. J. 998, sec. 551, note 80; 19 Cal. Jur. 606, sec. 42, note 18; but an intoxicated person is held to the same degree of care as one not intoxicated, 45 C. J. 997, sec. 551; 19 Cal. Jur. 606, sec. 42; 20 R. C. L. 129, sec. 107.

 Appellants and counsel *amicus curiae* criticize instruction No. 6 on the ground that where there is direct evidence of an accident the presumption of self-preservation has no place and contend that *Packard v. O'Neil*, 45 Ida. 427, 262 Pac. 881, 56 A. L. R. 317, lays down the rule that the presumption of due care and circumspection on the part of one injured in an accident does not prevail where there are eyewitnesses to the accident or that the holding therein constitutes a pitfall inviting disaster to those who rely upon it or oppose it and cite: *Maupin v. Solomon*, 41 Cal. App. 323, 183 Pac. 198; *Anning v. Rothschild & Co.*, 130 Wash. 232, 226 Pac. 1013; *Blue Bar Taxicab & Transfer Co. v. Hudspeth*, 25 Ariz. 287, 216 Pac. 246; *Kish v. California, etc.*, 190 Cal. 246, 212 Pac. 27; *Smellie v. Southern Pac. Co.*, 212 Cal. 540, 299 Pac. 529; *Tegtmeyer v. Byram*, 204 Iowa, 1169, 216 N. W. 613; *Brown v. McAdoo*, 195 Iowa, 286, 188 N. W. 7; *Weber v. Pittsburgh & W. V. Ry. Co.*, 300 Pa. 351, 150 Atl. 624; *Tull v. Baltimore & O. R. Co.*, 292 Pa. 458, 141 Atl. 263; *Fairchild v. Detroit, G. H. & M. Ry. Co.*, 250 Mich. 252, 230 N. W. 167; *Rogers v. Interstate Transit Co.*, 212 Cal. 36, 297 Pac. 884, certiorari denied, 284 U. S. 640, 50 Sup. Ct. 22, 76 L. ed. 545; *Young v. Pacific Elec. Ry. Co.*, 208 Cal. 568, 283 Pac. 61, in support of this position. These cases have been variously construed, followed, distinguished, departed from or merely disregarded as will appear from an examination of the following cases where some of those cited are mentioned: *Everett v. Standard Acc. Ins. Co.*, 45 Cal. App. 332, 187 Pac. 996; *Randolph v. Hunt*, 41 Cal. App. 739, 183 Pac. 358; *Judson v. Bee Hive Auto Service Co.*, 136 Or. 1, 294 Pac. 588, 297 Pac. 1050, 74 A. L. R. 944; *Hanchett v. Wiseley*, 107 Cal. App. 230, 290 Pac. 311; *Rock v. Orlando*, 100 Cal. App. 498, 280 Pac. 377; *Osborne v. Baughman*, 85 Cal. App. 224,

259 Pac. 70; *Landsrath v. Industrial Acc. Com.*, 77 Cal. App. 509, 247 Pac. 227; *Clendenning v. Parker*, 69 Cal. App. 685, 231 Pac. 765; *Poncino v. Reid-Murdoch & Co.*, 212 Cal. 325. 298 Pac. 818; *Perry v. A. Paladini, Inc.*, 89 Cal. App. 275, 264 Pac. 580; *Smellie v. Southern Pac. Co.*, 212 Cal. 540, 287 Pac. 343, 299 Pac. 529; *Market St. Ry. Co. v. George*, 116 Cal. App. 572, 3 Pac. (2d) 41; *Irwin v. Pickwick Stages System*, 134 Cal. App. 443, 21 Pac. (2d) 981, 25 Pac. (2d) 998; *Pozzobon v. O'Donnell*, 1 Cal. App. (2d) 151, 36 Pac. (2d) 236; *Bourne v. Northern Counties Title Ins. Co.*, 4 Cal. App. (2d) 69, 40 Pac. (2d) 583; *Hoffmann v. Lane*, 11 Cal. App. (2d) 655, 54 Pac. (2d) 477; *Crouch v. Gilmore Oil Co.*, 5 Cal. (2d) 330, 54 Pac. (2d) 709.

An examination of these authorities and many others included in the note on this subject in 84 A. L. R. beginning at page 1221 and 12 N. C. C. A. 535; 23 N. C. C. A. 424; 35 N. C. C. A. at 645 and 694; discloses that the editorial introduction to the 84 A. L. R. note that it is not possible to reconcile all of the cases, some even in the same jurisdiction, is correct. The following conclusions however are generally accepted as correct: First, where there are no eye-witnesses and a person is killed and there are no circumstances indicating clearly to the contrary, there is a presumption that he was at the time of the accident in the exercise of due care and caution; where there are eye-witnesses two rules apply: One that the presumption vanishes, the other divided into two subdivisions; one that if the evidence as against the presumption is clear, convincing and uncontradicted, such evidence will prevail as a matter of law against the presumption. The other that if reasonable minds might differ as to the conclusions to be drawn from the evidence opposed to the presumption, the presumption has the weight and effect of evidence to be considered by the jury in connection with the contrary evidence.

The reasons given by the court in the O'Neil case, *supra*, as to why the instruction, *"probably"* should not have been given were: That there were eye-witnesses, and no attempt to prove contributory negligence, while herein the defense of contributory negligence was set up and urged particularly in

connection with the claimed intoxication of deceased, and in the following cases this court had definitely committed itself to the doctrine that where there is a conflict between the presumption and contrary evidence, from which reasonable minds might draw different conclusions, it is proper to instruct the jury as to the presumption.

In *Adams v. Bunker Hill etc. Min. Co.*, 12 Ida. 637, 89 Pac. 624, 11 L. R. A., N. S., 844, a judgment on a nonsuit was reversed in which the court held where Adams was killed in the company's mill and no one was present at the time of the accident there was a presumption, which might be rebutted by proof of acts of the injured person or circumstances surrounding the accident, that the person killed was in the exercise of ordinary care. This case was cited as authority for the approval in *Fleenor v. Oregon Short Line R.R. Co.*, 16 Ida. 781, 102 Pac. 897, where there were eye-witnesses of the accident, of the doctrine stated by the trial court in this instruction:

"The Court instructs the jury that after the plaintiff has proven carelessness and negligence on the part of the defendant, if she has so proven them, the presumption is that the deceased used ordinary care and prudence at the time of the alleged injury, and it is incumbent upon the railroad company to prove that the deceased was the immediate cause of the injury resulting in his death, and it is incumbent upon the railroad company to establish this by a preponderance of the evidence."

even though the court there said:

"The evidence of the eye-witnesses tended very strongly to refute this presumption, and to show that as a matter of fact Fleenor did not look or listen, and the decided preponderance of the evidence is in favor of the defendant. There were, however, sufficient facts and circumstances shown upon the trial to entitle the plaintiff to have the case submitted to the jury on the question, both of the negligence of the defendant and of the contributory negligence of the deceased. The jury saw and heard all the witnesses and had all the facts and circumstances before them, and have preferred to believe the evidence produced on the part of the plaintiff and

the plaintiff's theory of the case, and under the mandate both of the statute of this state (sec. 4824, Rev. Codes) and the repeated decisions of this court, we would not be justified in disturbing the verdict on this ground."

In *Staab v. Rocky Mountain Bell Tel. Co.*, 23 Ida. 314, 129 Pac. 1078, where there were eye-witnesses, the court approved the doctrine where this instruction was given:

"It may be inferred until the contrary is proved by evidence that one who is killed by a dangerous agency was using due and proper care for the protection of his person and the preservation of his life. This natural inference arises because of the instinct of self-preservation and the known disposition of men to avoid injury and personal harm to themselves."

In *Chiara v. Stewart Min. Co.*, 24 Ida. 473, 135 Pac. 245, there were eye-witnesses of the actions of deceased immediately before and after the accident, and the court approved the doctrine where this instruction was given:

"The jury are instructed that where an injury has resulted in the death of an employee, and his legal representatives are prosecuting an action for damages, when they have established the fact of his death and that it resulted from the negligence of the defendant there at once arises a legal presumption that the deceased was exercising due and proper care for the protection of his person and preservation of his life. The presumption which arises in favor of the instincts of self preservation and the known disposition of men to avoid injury and personal harm to themselves is sufficient to constitute *prima facie* evidence that the person killed was at the time of the accident free from contributory negligence. By *prima facie* evidence is meant such evidence of a fact as in the judgment of the law is sufficient to establish the fact and if not rebutted remain sufficient for that purpose. This presumption does not overcome proof that the deceased had voluntarily placed himself in a position of peril."

In *Graves v. Northern Pac. Ry. Co.*, 30 Ida. 542, 166 Pac. 571, a jury was waived but the court approved the doctrine that the presumption is that one who is killed while crossing a railway track exercised due care and caution, citing *Fleenor v. Oregon Short Line Ry. Co.*, *supra*.

The last case and a number of others involved accidents at railroad crossings. Some of the cases cited by *amicus curiae* had to do with the presumption that from the use by one of the automobile of another there was a presumption that the one using the car was on the owner's business, and if the principle of those cases is applicable to support the contention that the presumption may not prevail, the principle announced in the railway crossing cases should be as applicable to the contrary.

*Webb v. Gem State Oil Co.*, 56 Ida. 465, 55 Pac. (2d) 1302, was an industrial accident case but the presumption is thus announced at page 471. It is true there were no eye-witnesses to the accident:

"When the hearing was had before the board Webb was insane and his testimony was not available. This situation makes applicable the rule often applied where the lips of a witness have been sealed by death. It is thus stated in *Chiara v. Stewart Min. Co.*, 24 Ida. 473, 478, 135 Pac. 245:

" 'The presumption must be indulged, in the absence of proof to the contrary, that one who was killed while engaged at his duties was exercising reasonable care and precaution for the protection and preservation of his person and life, and that he was possessed of the ordinary instincts for self-preservation.'

"See, also, *Staab v. Rocky Mountain Bell Tel. Co.*, 23 Ida. 314, 129 Pac. 1078.

"The instincts of self-preservation which prompt a man to avoid negligently exposing himself to danger, prompt him, with equal or greater force, to refrain from injuring himself by design, and, in this case, raises a disputable presumption that Webb's injury was accidentally and not purposely inflicted.

"While, as heretofore pointed out, the burden was on respondent to show Webb's injury was caused by accident arising out of and in the course of his employment, it was not necessary for her to prove it by more than preponderance of evidence. The presumption that he did not hurt himself purposely is to be considered in deciding on which side the

evidence preponderates. In *Leach v. Grangeville Highway District*, 55 Ida. 307, 41 Pac. (2d) 618, we said:

" 'In a case of this kind the decision is to be made according to preponderance of evidence, and it is not incumbent on a claimant to establish the cause of his injury by proof of a higher degree than that, or to the exclusion of other possible causes. . . . . ' "

It is contended the testimony herein of Mrs. Furnish as a disinterested eye-witness conclusively overthrows the presumption of due care and caution by Geist. Such testimony being as follows:

"Q. Alright. Now, did you see this man, at any time, before the collision occurred?

"A. Well, he was immediately in front of the car and coming towards the car as Mr. Moore was trying to swerve around him.

"Q. Where was the man—what was he doing when you first observed him?

"A. When I first observed him he had his hands up like this (demonstrating).

"Q. Could you describe how he was walking or moving at all?

"A. I didn't see him walk only when he was—you know from the back seat you can't see very far in the road and I couldn't see how he was walking, but the first thing I noticed he was standing there with his hands up in the air—not standing, but walking towards the car.

. . . . . . . . . . . . .

"A. Well, we—I thought the man had a chance to get out of the way and I said so.

"Q. Well, when you saw him at the scene of the accident did he say anything or anything of that sort?

"A. Nothing that you could tell was words, really. He said 'did you hear that—did you hear that' and he kept repeating that. That was all that he said.

"Q. Did you detect any odor of liquor on him?

"A. Yes, sir.

"Q. And could he sit up by himself or did you have to hold him?

"A. No, he couldn't. He said he could. We asked him if he could and he said 'sure.'

"Q. I wish you would tell, as near as you can, the words he used.

"A. That is all the words I heard—that I heard. He was saying—first of all, I asked him if he could sit up and he said 'sure'. We sat him up and he couldn't sit up by himself, so I held him while the others were taking care of the other details to take him back to the hospital. Then he kept saying 'did you hear that—did you hear that'. He didn't seem to know. I supposed he was shocked and didn't know what he was saying.

"Q. Did he say anything about his leg or anything?

"A. Not anything at all. Said nothing about his leg.

"Q. Was there any details about that, that I have overlooked or that you haven't told, as far as you know, about your version of the accident?

"A. I told all I know.

. . . . . . . . . . . . . . . .

"Q. Your version was that his car was just about astride of the yellow line?

"A. Yes.

"Q. In other words, he swerved something like three or four feet at the time he hit him?

"A. Yes.

"Q. Did Mr. Moore cry out or anything or anybody make any remark at that time?

"A. Well, I know I said 'why doesn't he get out of there.'

"Q. 'Why doesn't he get out of there'?

"A. Yes.

"Q. That is all that was said, was it?

"A. Yes, I think so.

"Q. Now, there was no other traffic on the road right there at the time of the accident?

"A. No.

"Q. Wasn't another car in sight there, was there?

"A. There was no other.

"Q. You, at that time, had just about reached the foot of the down-grade there towards the viaduct of the International railway company tracks?

"A. Yes.

"Q. And it was a plain view from the top of the hill right down to the top of the viaduct, wasn't it?

"A. Yes, when the weather is clear.

"Q. And the road, for most of the distance down there, runs through more or less of cut, doesn't it?

"A. Well, I am not familiar with the road.

"Q. Didn't you notice that at all?

"A. No.

"Q. And the shoulders are about three feet wide beyond the pavement?

"A. Well—

"Q. Three feet or such a matter?

"A. I suppose.

"Q. And when you saw the man, he was laying out on the shoulder of the road of the way you were travelling?

"A. Yes, sir.

"Q. And it was your version, that as he struck the man, Mr. Moore was swerving heavily to the left, was it?

"A. Yes, very much.

"Q. And the man was clear off the road, where the accident occurred, afterwards, was he?

"A. Yes, sir.

"Q. And on the shoulder?

"A. Yes.

. . . . . . . . . . . . . . .

"Q. Will you state whether he was coming straight down the road or diagonally?

"A. The fellow was facing towards us.

"Q. Which way was he moving?

"A. Moving this way, about, with his hands up—towards the car.

"Q. Towards the car?

"A. Towards the front of the car.

"Q. Which way was the car from him?

"A. The car was going west—was going west and slanting a little bit the other way—I call it west, but going towards the other side, over to the left at that time.

"Q. How close were you to the man, you say, when you first saw him?

"By the COURT: She has answered that.

"Q. Did you see the man move at all?

"A. Yes.

"Q. That is what I am getting at.

"A. He was moving towards the front of the car and he was following us as we were swerving around him.

"Q. That is what I am getting at.

"A. Yes.

"Q. If the man had stayed where he was when you first saw him would the car have struck him?

"A. No, absolutely not.

"Q. You cut out straight, as I understand it and the car went towards the center and he went towards the center?

"A. He went towards the outside of our left and he was going with us.

"Q. He went the same way?

"A. Yes, he went the same way."

From the testimony of Mrs. Furnish and indeed from the testimony of Mr. Moore and Mrs. McKinnis the jury might have justifiably concluded that Geist, drunk or sober, was walking on either side of the center line or on the center line or came onto the highway just before the accident, that when he saw the car approaching, he threw up his hands either to make himself more conspicuous and as a warning not to be run over, or stop the car that he might get a ride, and that blinded or confused by the lights he went in the same direction that the car did as it was swerved to the left in order that he might get back on his right side of the road in the lane of traffic opposite to that in which the automobile was coming. As indicated elsewhere there was a decided conflict as to whether he was drunk or sober before or at the time of the accident. The testimony of Mrs. Furnish does not so conclusively show that Geist was so indifferent to his own safety that the presumption should not properly have been considered by the jury.

*Goff v. St. Louis Transit Co.*, 199 Mo. 694, 98 S. W. 49, 9 L. R. A., N. S., 244, is closest in point of any case found.

The action was by the widow for the death of her husband being run over by a street car. There was evidence *pro* and *con* as to his being intoxicated prior to and at the time of the accident. A dark rainy night. Testimony that with proper headlights the motorman should have been able to see at least 75 feet, that deceased was not seen until 10–30 feet from the car. The motorman and conductor were eye-witnesses, as are the occupants of the automobile herein. The accident happened on a public highway. The court held that the presumption that deceased was in the exercise of ordinary care at the time he was killed was applicable in spite of the fact that the evidence showed without dispute that he was lying on the track, with his head on a rail and that the front wheel of the front truck did not run over his head but pushed his head off the rail; that he was killed by a bolt near the front truck, which struck him in an eye and penetrated to the brain. His clothing looked like he had wallowed in the mud, one overshoe was on and one off, the inference being that he was intoxicated.

It was not erroneous to give the instruction complained of. Appellants and counsel *amicus* assert instructions 8 and 12 given the jury by the court do not properly state the doctrine of last clear chance and that:

" . . . . such rule presupposing: that the plaintiff was negligent; that as a result thereof he was in a position of danger from which he could not escape by the exercise of ordinary care; that the defendant is aware of the plaintiff's dangerous situation under such circumstances that he realizes or ought to realize the plaintiff's inability to escape therefrom; that the defendant then has a clear chance to avoid injuring the plaintiff by the exercise of ordinary care. If all of these elements are present, the rule applied and enables the plaintiff to recover notwithstanding his own negligence, but if any of them be absent, the rule does not apply and the case is governed by the ordinary rules of negligence and contributory negligence."

that is:

"The doctrine of last clear chance can only apply where after one discovers another in a condition of peril, he has a

clear chance and opportunity, and the means at hand, to avoid the accident.''

First, the instructions substantially stated the correct rule and second the facts themselves show that it was a debatable question, first as to the initial negligence of appellants, second the contributory negligence of deceased, and third whether after they discovered deceased in a place of peril from which he could or could not extricate himself there was time, opportunity, or chance for appellants to have saved him by the exercise of due diligence and care. This is apparent from the testimony of witnesses for the defense themselves: Moore:

'' . . . . as I was driving along I saw, on the left hand shoulder, possibly seventy-five to a hundred feet ahead of me, an object that I could not distinguish definitely whether it was a man or an animal. That, I couldn't positively state, but I certainly didn't increase my speed any and I went along, and then about, not to exceed twenty feet from me, possibly fifteen—I couldn't judge within five feet—but a man came out waving his hands in this manner here (demonstrating) and the minute I saw that I applied my brakes and also pulled way over to the left hand side. . . . . ''

An admission that 100 or 75 feet away something was seen which the jury could have justifiably concluded warned appellants to slow up, stop or avoid hitting the object, and from Moore's own testimony as to his claimed rate of speed there was then ample time to have avoided the accident.

Again Mrs. Furnish: ''A. Well, we—I thought the man had a chance to get out of the way and I said so.'' and she was sitting in the back seat.

The case therefore does not fall within the doctrine of last clear chance as applied in *McIntire v. Oregon Short Line R.R. Co.*, 56 Ida. 392, 55 Pac. (2d) 148, but as applied in *Branson v. Northern Pac. Ry. Co.*, 55 Ida. 220, 41 Pac. (2d) 629; *Asumendi v. Ferguson*, 57 Ida. 450, 65 Pac. (2d) 713; *York v. Alho*, 52 Ida. 528, 16 Pac. (2d) 980; *Bryant v. Hill*, 45 Ida. 662, 264 Pac. 869; *Hooker v. Schuler*, 45 Ida. 83, 260 Pac. 1027; *Short v. Boise Valley Traction Co.*, 38 Ida. 593, 225 Pac. 398; *Denbeigh v. Oregon-Washington Railroad & Nav. Co., supra; Rippetoe v. Feely*, 20 Ida. 619, 119 Pac. 465;

*Pilmer v. Boise Traction Co., Ltd.*, 14 Ida. 327, 94 Pac. 432, 125 Am. St. 161, 15 L. R. A., N. S., 254.

Appellants also complain because of respondents' examination on the *voir dire* of various jurors as to their being connected with any insurance company. Appellants made no objection at the time, invoked no ruling of the trial court and therefore there is no error of which they may now complain. (*State v. Davis*, 57 Ida. 413, 65 Pac. (2d) 1385; *State v. Wilson*, 51 Ida. 659, 9 Pac. (2d) 497; *Estate of Brown*, 52 Ida. 286, 15 Pac. (2d) 604; *State v. Keyser*, 38 Ida. 57, 219 Pac. 775; *State v. Chacon*, 36 Ida. 148, 209 Pac. 889; *Hurt v. Monumental Mercury Min. Co.*, 35 Ida. 295, 206 Pac. 184; *State v. Baker*, 28 Ida. 727, 156 Pac. 103.

The judgment is therefore affirmed. Costs awarded to respondents.

Morgan, C. J., and Holden and Ailshie, JJ., concur.

Petition for rehearing denied.

BUDGE, J., Dissenting. — Appellants appealed from a judgment for $25,000 entered against them May 19, 1936, and from an order denying their motion for a new trial, and also from the judgment of the court entered August 10, 1936, after the court had provisionally denied their motion for a new trial upon condition that respondents remit all that part of the previous judgment in excess of $10,000, which respondents did.

I shall direct my views to but one point, namely: Did the court err in refusing to grant a new trial, and, in lieu thereof, reducing the judgment, with respondents' consent, to $10,000?

There is no room for contention in this jurisdiction that where a judgment is merely excessive, power rests in the trial court and in this court to reduce the judgment, provided there is evidence in the record sufficient to sustain the judgment as so reduced. The trial court on August 4, 1936, notified counsel in a written communication in part as follows:

"I am of the further opinion that the damages rendered in said case are excessive and unwarranted by the evidence

and appear to have been given under the influence of prejudice. However, if the plaintiffs will remit that part of the judgment in excess of $10,000.00, the motion for new trial will be overruled. . . . . and if . . . . the same is not remitted a new trial will be granted."

Reference is made to said written communication in the court's order denying appellants' motion for a new trial in the following language:

"In this matter the defendants' motion for new trial having come regularly on for hearing, the defendants appeared with their attorneys Edge & Wilson and Wm. S. Hawkins and the plaintiffs were represented by their attorneys Whitla & Knudson. Thereupon said matters were argued and submitted and the Court on August 4th made a memorandum decision to the effect that the damages were excessive, but that the Motion for New Trial would be denied if the plaintiffs should remit that part of the judgment in excess of $10,000 and gives the plaintiffs until August 10th to file Notice of such remit herein, and the plaintiffs having heretofore duly filed in this Court notice that said judgment in excess of said sum would be remitted in accordance with the decision of this Court.

"IT IS THEREFORE ORDERED that the defendants' motion for a new trial be, and the same hereby is overruled and denied."

The written communication first referred to was filed October 30, 1936, and is included in the clerk's certificate to the transcript. It is one of the files in the case and is here for consideration. This written communication of August 4th and the order denying the motion for new trial should be considered together in determining whether or not the verdict of the jury was influenced by passion or prejudice. It will be noticed in the court's order denying the motion for new trial that there is omitted therefrom the following language used in the written communication of August 4, 1936:

(referring to the damages awarded) "and unwarranted by the evidence and appear to have been given under the influence of prejudice."

The verdict of the jury apparently shocked the sense of justice of the trial judge. He reduced the verdict from $25,000 to $10,000, wiping out $15,000 of the verdict. No other reasonable conclusion can be arrived at than that the trial judge was satisfied that the verdict of the jury was not only excessive but was arrived at as the result of passion or prejudice, as stated in his written communication of August 4, 1936. Where the verdict is the result of passion or prejudice the trial judge has no alternative except to grant a new trial.

There is another principle of law upon which there should be no disagreement. Where in any case a judgment rendered by a jury is so grossly excessive that it can be accounted for only upon the theory that the jury was actuated by passion or prejudice it is the duty of the court to set aside the verdict and grant a new trial. In *Tunnel Mining & Leasing Co. v. Cooper*, 50 Colo. 390, 115 Pac. 901, Ann. Cas. 1912C, 504, 39 L. R. A., N. S., 1064, it was said:

"Since, therefore, on principle and authority, the finding of the court that the verdict was excessive must be treated, in legal effect, as a finding that it was returned under the influence of passion and prejudice, it was reversible error to allow plaintiff to remit a portion of it, and enter judgment for the residue, because the gist of the whole matter is that no trial by an impartial jury has been had. To permit the court, in such situation, to substitute its judgment, as to the amount which the plaintiff ought to have, for that of the jury, would be in effect to deny the right of the defendant to such a trial as the general laws provide and the Constitution guarantees."

Where general damages have been recovered, if they be so excessive as to lead the court to suspect passion or prejudice, the court has no power to require a portion of the damages to be written off, and thereupon refuse a new trial. (*Savannah, F. & W. Ry. Co. v. Godkin*, 104 Ga. 655, 30 S. E. 378, 69 Am. St. 187; *Carpenter v. Village of Dickey*, 26 N. D. 176, 143 N. W. 964.) In *Cleveland Ry. Co. v. Mueller*, 31 Ohio App. 488, 166 N. E. 391, the docket entry disclosed:

"The plaintiff having accepted a *remittitur* of $2,000.00, the motion for a new trial is overruled, to which the defendant excepts. It is therefore considered that the plaintiff recover of the defendant her said damages less the *remittitur*, and also her costs of this suit."

In discussing this point the following language is used:

" 'pausing only to say that, when a trial court reaches the conclusion that a verdict returned by a jury in a personal injury case is $33\frac{1}{3}\%$ greater than it should be, and to that extent higher than the court can sustain, the case is one calling for the closest scrutiny and consideration by the trial judge on the subject of passion and prejudice on the part of the jury.'

"In the consideration of this case, we have in mind the docket entry of the court upon the question of *remittitur*. It does not state that it was because of passion or prejudice, or that it was not because of passion or prejudice, that the *remittitur* was made. Therefore, the *remittitur* was made independent of the claim of passion or prejudice, so far as the docket entry is concerned; but it appearing in the motion for new trial, under the third assignment of error, that the verdict is excessive, appearing to have been rendered under the influence of passion or prejudice, it follows by inference at least, from the record, that the verdict was reduced to one-half the amount because of passion and prejudice."

In the instant case the verdict was reduced $15,000,—in other words, from $25,000 to $10,000. What other inference could be drawn than that the verdict of the jury was the result of passion and prejudice?

The general rule is that if the verdict is not the result of passion or prejudice it may be reduced by remission; if the verdict is the result of passion or prejudice it must be set aside and a new trial granted. (*Cotton v. Ship-By-Truck Co.*, 337 Mo. 270, 85 S. W. (2d) 80; *Rafferty v. Public Service Interstate Transp. Co.*, 13 N. J. Misc. 80, 177 Atl. 357; *World Oil Co. v. Hicks*, (Tex. Civ. App.) 75 S. W. (2d) 905; *Ahrens v. Fenton*, 138 Iowa, 559, 115 N. W. 233; *Rhyne v. Turley*, 37 Okl. 159, 131 Pac. 695; *Minneapolis St. Paul & Sault Ste. Marie Railway Co. v. Moquin*, 283 U. S. 520, 51 Sup. Ct. 501,

75 L. ed. 1243; *Smith v. Martin,* 93 Vt. 111, 106 Atl. 666; *Arkansas Valley Land & Cattle Co. v. Mann,* 130 U. S. 69, 9 Sup. Ct. 458, 32 L. ed. 854; *McAfee v. Ogden Union Ry. & Depot Co.,* 62 Utah, 115, 218 Pac. 98; *Adcock v. Oregon R. & N. Co.,* 45 Or. 173, 77 Pac. 78; *Henderson v. Dreyfus,* 26 N. M. 541, 191 Pac. 442; *Leinbach v. Pickwick Greyhound Lines,* 135 Kan. 40, 10 Pac. (2d) 33; *Yard v. Gibbons,* 95 Kan. 802, 149 Pac. 422; *Gila Valley, G. & N. Ry. Co. v. Hall,* 13 Ariz. 270, 112 Pac. 845; *Kohut v. Boguslavsky,* 78 Colo. 95, 239 Pac. 876; *Schendel v. Bradford,* 106 Ohio St. 387, 140 N. E. 155.)

I. C. A., sec. 7–602 provides:

"The former verdict or other decision may be vacated and a new trial granted on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: . . . .

"5. Excessive damages, appearing to have been given under the influence of passion or prejudice. . . . . "

The trial judge in his written communication of August 4th, followed the provisions of subd. 5 of I. C. A., sec. 7–602, *supra,* substantially when he stated "I am further of the opinion that the damages rendered in said case are excessive and unwarranted by the evidence and appear to have been given under the influence of prejudice," and it was no doubt mainly for the latter of the foregoing reasons that the trial judge required respondents to remit $15,000 of the judgment, otherwise a new trial would be granted. In other words, the court formally notified counsel for respondent that a new trial would be granted unless the judgment was reduced, basing his decision on two grounds, first, that the judgment was excessive and unwarranted by the evidence and, second, that the verdict appeared to have been given under the influence of prejudice. To uphold the judgment herein, as entered by the court, is in effect a denial of the right to a jury trial. To permit the judgment entered by the court to stand, based in part upon a verdict of the jury given under the influence of prejudice, is contrary to the great weight of authority. Where a verdict is rendered as a result of passion or prejudice it is no legal verdict. The judgment should be reversed and the cause re-

manded with directions to grant a new trial and submit to another jury the determination of the amount of damages, if any, sustained by respondents.