(No. 7022. January 30, 1943.)

HOWARD LUTHER, Respondent, v. FIRST BANK OF TROY, a corporation, and OLE BOHMAN, Appellants.

[133 Pac. (2d) 717.]

Verner R. Clements for appellants.

F. C. Keane and Eugene McCann for respondent.

GIVENS, J.—Respondent, while living at Troy, Idaho, had for approximately 13 years transacted business with the appellant First Bank of Troy, of which appellant Ole Bohman was president. December 1, 1936, respondent and his wife signed a chattel mortgage and renewal notes for $1000 and $500, which they understood to be all they owed the bank; subsequently, they borrowed $100 and $50. Respondent held a sale September 29, 1937, at which Mr. Bohman acted as clerk, the proceeds of which were to be applied on the mortgage indebtedness. Respondent claimed that after the sale he advised Mr. Bohman he was going to Deary the following day to sell his wheat and would return to settle with the bank, also, that Mr. Bohman advised him the proceeds of the sale (not then stat-

ed, but amounting to about $2039.40) were sufficient to take care of his indebtedness. Mr. Bohman denied this conversation.

September 30, respondent sold the wheat to Mark P. Miller Milling Company, throught its agent Gust Dahl. Respondent advised Mr. Dahl the wheat was mortgaged but that the debt had been taken care of, and he was given a check for approximately $1800, which he cashed the same day at Moscow. Friday, October 1, respondent went to Spokane, after mailing a letter to Mr. Bohman telling him he would settle with him Monday. Respondent and his family moved to Prichard, Idaho, Saturday, October 2. Monday, October 4, he and his son went to the bank at Troy. He was there advised he owed the bank $3600— a note for $416 in addition to the notes above listed, and a conditional sales contract for some machinery, a threshing bill, and a seed bill, which had been left with the bank for collection. Respondent stated he owed the bank only $1650 and the interest and that was all he was there to pay. An argument ensued, during which, respondent claimed, Mr. Bohman called Mr. Dahl on the telephone and advised him the bank was holding him responsible for buying mortgaged wheat and that he had better do something about it. Mr. Bohman denied this telephone conversation also. Respondent left the bank after stating if the bank didn't want to settle, he would go to court.

That evening Mr. Dahl went to Moscow to consult his employer and then went to J. C. Peterson, a justice of the peace. The justice of the peace telephoned the prosecuting attorney, who, on the information given him over the phone, typed the criminal complaint. Mr. Dahl and Mr. Peterson went to the office of the prosecuting attorney, a few blanks in the complaint were filled in, and it was signed by Mr. Dahl and a warrant issued. There is no evidence the prosecuting attorney was advised that Luther claimed his account with the bank had been taken care of by the proceeds of the sale or that Luther had advised Mr. Bohman the day of the sale that he was going to Deary the next day to sell the wheat and would return to settle with the bank. The complaint charged respondent with the crime of grand larceny by wilfully, knowingly, feloniously, and with intent to steal, selling 2447 bushels of grain which were mortgaged to the bank, which mortgage was at that time unsatisfied. (Sec. 44-1017, I. C. A.)

October 5, respondent learned a warrant for his arrest had been issued. He immediately went to Moscow where he consulted with and employed an attorney, paying him $250 for his services, after which he returned to his home at Prichard.

A preliminary hearing was had October 18 upon the above criminal charge, and at the conclusion thereof respondent was released on the ground no crime had been committed, and the action was dismissed.

Respondent filed the present action, asking for $300 special damages and $10,000 general and punitive damages because of the above criminal prosecution. Appellants answered, and at the close of the trial the jury found for respondent in the sum of $5350, from which verdict and judgment thereon appellants have appealed.

Appellants specify as error that certain admissions contained in their answer were not properly submitted to the jury, that the court erred in giving instruction No. 6, that the evidence is insufficient to sustain the verdict, and that the damages were excessive.

██ While the failure to instruct the jury as to all of the admissions made by appellants in their answer was not reversible error, in view of the fact that a new trial is granted upon other grounds, it is pertinent to observe that in stating the issues to the jury, the allegations, denials, and admissions by both parties should be clearly though succinctly stated in the instructions outlining the issues as presented by the pleadings of all parties.

██ Instruction No. 5 was as follows:

"You are instructed that before the plaintiff can recover in an action of this kind, you must find from the evidence that want of probable cause and malice co-existed.

"Probable cause as is applicable to this action is (the existence of such facts or circumstances as would excite the belief of a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted.)"

and was apparently taken from *Nettleton v. Cook*, 30 Ida. 82, 163 Pac. 300, which instruction was approved in *De-Lamater v. Little*, 32 Ida. 358, 182 Pac. 853, and *Douglas v. Kenney*, 40 Ida. 412, 233 Pac. 874. This instruction was therefore correct and sufficient. The court, however, in addition thereto gave instruction No. 6:

"I instruct you that probable cause is defined to be a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense of which he is charged."

Just what different meaning the jury might have attached to the use of the words "suspicion" and "a cautious man" in instruction 6 as compared with instruction 5 it is difficult, if not impossible, to say. They are, in any event, to some extent conflicting, and there does not appear to have been any necessity for giving instruction No. 6 since No. 5 adequately set forth the defense of probable cause. We therefore do not approve instruction No. 6, though we are not prepared to say that it was necessarily prejudicial. (*Suhr v. Lindell,* 133 Neb. 856, 277 N. W. 381; *Malcolm v. Mooresville Cotton Mills,* 191 N. C. 727, 133 S. E. 7; *Rayl v. Syndicate Bldg. Co.,* 118 Cal. App. 396, 5 Pac. (2d) 476.)

The court early announced the doctrine that actions for malicious prosecutions are not favored in law and are hedged around by limitations more stringent than in other causes of action for damages (*Russel v. Chamberlain,* 12 Ida. 299, 85 Pac. 926), and therein set forth the essential requirements to prove an action of this kind as follows: (1) That there was a prosecution; (2) that it terminated in favor of the plaintiff; (3) that the defendants were prosecutors; (4) that they were actuated by malice; (5) that there was a want of probable cause; and (6) the amount of damages plaintiff has sustained.

The basis for damages in this kind of an action is, of course, the shame, humiliation, and actual injury to one's reputation and business, physical injury, if any (not contended to be present herein), and expenses sustained by the false arrest, that is, arrest without probable cause. (38 C. J. 445.)

The evidence in this case indicates respondent appeared in open court the day after the complaint was filed, apparently without having been served with the warrant of arrest; that he was released on his own recognizance to await the preliminary hearing. As to the damages suffered by him, the testimony is as follows:

"Q. Now, what publicity was given to your arrest on this charge of grand larceny?

"A. Well, I think, quite a bit.

"Q. Well, go ahead and explain.

"A. Well, I heard quite a bit that I was arrested for selling mortgaged wheat and that was bad on my part.

"Mr. Clements: We object to any conversations of what was said to him unless they were made in defendants' presence.

"Mr. Keane: That is right.

\* \* \*

"Q. Now, when did you first learn that there was a warrant out for you?

"A. The next day after I was here in Moscow to settle up with him.

"Q. That would be the 5th day of October?

"A. I don't remember the dates.

"Q. Well, it was day after the 4th?

"A. Yes, it was the day after I was—

"Q. And upon learning that a warrant was out for you, what, if anything, did you do?

"A. Come right to Moscow that night.

"Q. And who, if anyone, did you see that night?

"A. Latham Moore.

"Q. What arrangement did you make with Latham Moore with reference to that warrant?

"A. I employed him to take care of it.

"Q. Did you make any arrangements with him with reference to a fee at that time?

"A. Yes, sir.

"Q. What arrangements did you make?

"A. $250.00 I paid him.

\* \* \*

"Q. Did you go back home prior to the time of the preliminary examination?

"A. Yes, sir.

\* \* \*

"Q. Did you attend that preliminary examination?

"A. Yes, sir.

"Q. Now, what expense, if any, did you incur on making this trip on the 5th of October and again on the 18th of October?

"A. I don't remember exactly, but it was quite a little.

"Q. Well, what is your estimate as to what it was?

"A. Well, it was anyhow fifty dollars.

"Q. For the two trips?

"A. Yes, sir.

"Q. State whether or not the fact that a criminal complaint charging you with grand larceny became known to your neighbors in Prichard?

"A. Yes, it did.

\* \* \*

"Q. Now, you had a wider circle of friends down around Troy, did you not?

"A. Yes, sir, I did.

"Q. During the time that you lived there?

"A. Yes, sir.

"Q. Have you even been in any trouble, or has any criminal complaint ever been filed against you for anything, other than the charge which we have been discussing here?

"A. No, sir.

"Q. Never been in, any trouble of any kind—

"A. No, sir.

"Q. Nature or description?

"A. No, sir."

While the amount of damages is peculiarly for the jury to determine under the facts of each particular case, this court can nevertheless determine whether or not the damages are so large as to indicate the influence of passion and prejudice in the verdict. If the verdict is excessive but does not indicate such influence of passion and prejudice as to taint the entire verdict, that is, indicate that the rendering of any verdict against the defendant was because of passion and prejudice, merely that the verdict is excessive in amount, this court has reduced the amount, making its acceptance optional. (*Maloney v. Winston Bros. Co.*, 18 Ida. 740, 111 Pac. 1080; *Kinzell v. Chicago etc. Ry. Co.*, 33 Ida. 1, 190 Pac. 255; *Roy v. Oregon Short Line R. R. Co.*, 55 Ida. 404, 42 Pac. (2d) 476.) If, however, passion and prejudice evidently entered into the jury's deliberations not only as to the amount of the verdict but as to contributing to its returning

any verdict at all, the verdict is vitiated and the only constitutional protection is to grant a new trial. (*Neil v. Idaho & Washington N. R. R.*, 22 Ida. 74, 125 Pac. 331; *Geist v. Moore*, 58 Ida. 149, 70 Pac. (2d) 403; *Olson v. Northern Pac. Ry. Co.*, 49 Wash. 626, 96 Pac. 150, 18 L. R. A., N. S. 209; *Puget Sound Lbr. Co. v. Mechanics' & Traders' Ins. Co.*, 168 Wash. 46, 10 Pac. (2d) 568; *Leek v. Northern Pac. Ry. Co.*, 65 Wash. 453, 118 Pac. 345; *Caldwell v. Northern Pac. Ry. Co.*, 56 Wash. 223, 105 Pac. 625; *De Phillips v. Neslin*, 155 Wash. 147, 283 Pac. 691; *Chenooweth v. Great Northern Ry. Co.*, 50 Mont. 481, 148 Pac. 330; *Hall v. Northern Pac. Ry. Co.*, 56 Mont. 537, 186 Pac. 340; *Gillespie v. Great Northern Ry. Co.*, 63 Mont. 598, 208 Pac. 1059; *Blessing v. Angell*, 66 Mont. 482, 214 Pac. 71; *Phillips v. Thomas*, 70 Wash. 533, 127 Pac. 97, 42 L. R. A., N. S. 582, Ann. Cas. 1914B 800; *Kusah v. McCorkle*, 100 Wash. 318, 170 Pac. 1023, L. R. A. 1918C 1158.)

Since a new trial is granted, we will not go into, particularize, or detail the evidence. Suffice it to say that it is extremely weak, even evanescent, as to proving under the requirements as to this kind of an action that appellants were legally responsible for respondent's arrest, and, by the excerpted portions of the testimony quoted above, likewise, as to respondent's having suffered any material damage. We are constrained, therefore, to hold that the size of the verdict which, over and above the amount of the actual damage of $300, was evidently for general and punitive damages, is so excessive as to demand the granting of a new trial, which is therefore ordered.

Judgment reversed. Costs awarded to appellants.

Holden, C.J., Ailshie, J., and Sutton, D.J., concur.

BUDGE, J., dissenting—After a careful examination of the record and the authorities, I have reached the conclusion that I cannot concur in the majority opinion for the reason that the evidence is insufficient to sustain the jury's verdict and the judgment based thereon. The judgment should be reversed, the cause remanded, with instructions to dismiss the action.