(No. 7087. December 15, 1943.)

GERTRUDE SUMMERFIELD, Respondent, v. CLARA M. PRINGLE, Appellant.

[144 Pac. (2d) 214.]

Rayborn and Rayborn and Hawley and Hawley for appellant.

Chapman and Chapman for respondent.

BUDGE, J.—This action is brought by respondent to recover damages for alienation of affections of her former husband, P. H. Pringle, by appellant. The cause was tried by the court and jury resulting in a verdict in favor of respondent and assessing her damages in the sum of $50,000, upon which verdict, judgment was entered, from which this appeal is prosecuted.

The trial court in instruction No. 1, briefly summarized the pertinent allegations contained in the amended complaint of respondent and the answer thereto by appellant as follows:

"By her second amended complaint the plaintiff alleges in substance: That on or about the 11th day of April, 1937, at Sacramento, State of California, the plaintiff was lawfully married to P. H. Pringle, who is the son of the defendant, Clara M. Pringle; that pursuant to a judgment and decree of divorce, entered in this court * * * plaintiff herein was restored to her maiden name of Gertrude Summerfield; that by reason of said marriage the plaintiff became and was entitled to the support, company, society, and protection of her said husband, and that from and after the time of said marriage and until the interferences on the part of the defendant hereinafter set forth, said P. H. Pringle was deeply attached to his said wife, the plaintiff, and the plaintiff and her said husband lived happily together as husband and wife, and, but for the wrongful and malicious acts of the defendant hereinafter set forth, they would have continued so to live as husband and wife.

"That following said marriage * * * up to and until the fall of 1938, they resided at Sacramento, California, and that upon the solicitation and inducement of the defendant, thereafter they established their home on a farm owned by defendant near the village of Kimberly, in Twin Falls County, Idaho, and immediately upon their residing within the State of Idaho defendant conceived and harbored an intense dislike and hatred of plaintiff, and from said time did wrongfully and maliciously, by the use of subtle arts, contrivances, and threats, and knowing the said P. H. Pringle to be the husband of the plaintiff, continuously and systematically sought to prejudice and poison the mind of said P. H. Pringle against the plaintiff, and to alienate his affections from her by falsely telling him that the plaintiff was not good enough for him, and occupied a station in life beneath him; that plaintiff was not strong enough to be a farmer's wife; that plaintiff had no regard for money and spent it unnecessarily; that plaintiff had married him on account of defendant's money; and further by defendant referring to plaintiff in the presence of said P. H. Pringle as 'that woman', and by displaying an attitude and pursuing a course of conduct towards plaintiff in the presence of said P. H. Pringle designed to convey to said P. H. Pringle the fact that defendant did not approve of plaintiff as the wife of said P. H. Pringle; and by suggesting and encouraging said P. H. Pringle to mistreat plaintiff, both physically and mentally, in an attempt to force plaintiff to leave said P. H. Pringle, and that unless the said P. H. Pringle separated from and got rid of plaintiff, said defendant would refuse to renew the lease of the premises farmed by said P. H. Pringle and owned by said defendant; would refuse any financial assistance to said P. H. Pringle, and would disinherit the said P. H. Pringle, who, together with a sister, are the only heirs of said defendant, and thus threatening to deprive said P. H. Pringle of an inheritance of in excess of $250,000.00; and that the defendant, by the continued and systematic use of her said arts and contrivances, and by said repeated threats to the said P. H. Pringle, did wrongfully and maliciously alienate the affections of the said P. H. Pringle from the plaintiff herein, and that as a result thereof, on or about the 25th day of May, 1940, the said P. H. Pringle and the plaintiff herein became separated, and on or about the 14th day of October, 1941, became divorced, because of the fault of said P. H. Pringle; that

by reason of the wrongful and malicious acts on the part of the defendant hereinabove alleged, said P. H. Pringle became estranged from plaintiff and his affections and regard for her were destroyed, and plaintiff has been wrongfully deprived by the defendant of the comfort, society, support and protection of her husband, and of the happiness and benefits she otherwise would have received at his hands, and has suffered great distress of mind, body, and estate, to her damage in the sum of $50,000.00; and is entitled to punitive damages by reason of the wrongful, malicious and wilful acts of the defendant hereinabove alleged in the sum of $25,000.00. Plaintiff prays judgment against the defendant in said amounts.

"In answer to said complaint the defendant denies each and every allegation of said complaint except that defendant admits that the plaintiff and P. H. Pringle, who is the son of the defendant, were lawfully married April 11, 1937, at Sacramento, California; and that pursuant to a judgment and decree of divorce, as alleged in said complaint, the plaintiff herein was restored to her maiden name of Gertrude Summerfield. Defendant prays that the plaintiff take nothing by reason of her complaint herein."

Appellant has assigned and relies upon six assignments of error, some of which are subdivided. We will not discuss the assignments in the order set out in appellant's brief but will undertake to cover all material errors assigned. We will first consider assignment of error No. 4, namely that: "The evidence is insufficient to sustain the verdict and the judgment * * *." The record is voluminous and it would be pointless to undertake to recite the evidence at length. The following synopsis of evidence adduced upon the trial finds support in the record.

Respondent, Gertrude Summerfield, and P. H. Pringle first met in November, 1936, while both were residing and working in Sacramento, California. During the Christmas holidays of that year, 1936, respondent was introduced by P. H. Pringle to his father and mother, appellant herein. Respondent and P. H. Pringle were married April 11, 1937, in Sacramento. Respondent testified that while she and her husband lived in California, they "had been very happy." In November, 1938, at appellant's request, the young couple moved to Twin Falls County to go on one of appellant's farms. Upon their arrival in Twin Falls, they were met by appellant who, upon seeing respondent, remarked: " 'Oh,

did you come too? I thought you'd stay in California until Harold got things settled.'" While respondent and her husband were making the farm house liveable, they stayed some three weeks with appellant, whose attitude even at this early date was "very cool" towards respondent, being evidenced in such small ways as not talking to respondent at the dinner table and not passing food to her; and also referring to respondent as a "snip", and criticising respondent's house cleaning to such an extent that respondent apologized for her lack of training in scrubbing floors and so forth, and asked appellant to be more patient.

After the couple moved onto the farm, they experienced, while appellant was absent, tranquil, natural days of life conducive to a happy, stable marriage. But a careful reading of the transcript forces upon one's consciousness a feeling of impending disaster, a sort of inharmony between husband and wife resulting from appellant's dominance, which overshadowed the lives of this young couple all the while they were on the farm. In the fall of 1939, respondent's husband became ill and was confined to bed, the attending doctor diagnosing the illness as pneumonia. Appellant did not believe her son had pneumonia and she and respondent became engaged in a heated controversy in the presence of the son, the registered nurse, and appellant's close friend, Mrs. Read, at which time respondent told appellant "that the doctor had diagnosed Harold's condition as pneumonia", whereupon appellant retorted that respondent had "no business getting a doctor; * * * had no business hiring nurses; * * * was entirely too extravagant with her [appellant's] money," and respondent replied they were spending their "own money, not her money." Appellant then told her bedfast son that "if he got well he would have to leave the farm because she was not going to let" respondent "stay there any longer. * * * 'That woman will have to leave the farm. She cannot stay here another year,'" and "'if you don't get rid of her I will disinherit you'". Thereafter, the two women never got along at all, although respondent sought for a reconciliation only to be rebuked by the words "'No,'" she "would have to go." After the occurrence just related, upon appellant's frequent visits to the farm, she would not go into the house, but would drive into the yard, honk the horn on her automobile, and respondent's husband would go out and talk with her. After nearly every one of appellant's visits to the farm, her son would come into the

house, quarrel with his wife, respondent, inflict abuse upon her, charge her with being the cause of his losing his inheritance, state that she was not "worth that much", order her off the farm, and on numerous occasions inflict corporal punishment upon respondent distracting her so greatly as to cause her to attempt suicide. At Christmas time, appellant gave her son a Christmas present, and a small Christmas present to one of her farm tenants, but gave none to respondent, and thus, as upon numerous occasions, by her acts and conduct and general attitude toward respondent, without speaking, she spoke, clearly demonstrating her ill will and dislike for respondent. Finally, fearing for her life, and having made a final and vain attempt to persuade appellant to give them another chance, respondent left her husband.

Other witnesses corroborated much of respondent's testimony. The registered nurse, Mrs. Marie Wullschleger, verified respondent's version of the climatic quarrel between daughter and mother-in-law. Mrs. Crom, a neighbor, testified that she was present on one occasion when appellant snubbed respondent, and on another occasion she observed respondent's black eye and bruised hips inflicted by respondent's husband; and that the husband told her: "My mother comes out and jumps on me and it seems I always take my spite out on Gertie." One Harry Langer testified: "She wanted to know if we heard from Gertrude lately and I said: 'We have.' She wanted to know how often we hear, and I said: 'Once in a great while.' She asked if we thought she would ever go back to Harold. I said: 'I don't know but I think she will.' She said: 'I told Harold if he did'nt get rid of Gertrude he would be cut off from my estate, and leave him without a penny and my daughter would get it all.'" Langer's 15 year old son, Lynn, was present when appellant made the above statement, and also testified to the same effect. One John D. Noland testified that before respondent and appellant's son were married, but after appellant had been introduced to respondent during the Christmas holidays of 1936, he had the following conversation with appellant: "Well in the conversation I asked her how she liked the young lady, and she said: 'Well,' she said: 'she is too frail and she is too small to make a farmer's wife.' She said: 'I am going to do everything I can to break them up and if they do get married I will break them up afterwards.'" The wrongful influence of appellant upon her son's affection for respondent, subsequent to their marriage,

was like a thing that springs up from within, consumes the vitals and destroys the structure.

There is much conflicting testimony. However, if respondent's testimony is to be believed (and that is a matter solely for the jury to determine) appellant was the sole cause of her son's loss of affection for respondent. "While there is not much evidence corroborative of her statements, none is required to sustain the verdict in this court. We are not permitted to retry the facts. If there is substantial evidence in the record sustaining the verdict and judgment, though it be but the evidence of one witness, and that witness the person in whose favor the verdict and judgment is rendered, we have no rightful power to reverse the judgment for want of facts, no matter how strongly we may be convinced that the evidence preponderates with the other side. * * * appellant is concluded by the finding of the jury." *Stanley v. Stanley*, 32 Wash. 489, 73 P. 596. In the instant case, there is abundant, substantial evidence to support the verdict of the jury that appellant alienated P. H. Pringle's affections for respondent by malicious, wrongful threats to disinherit and by continuous and systematic acts and conduct, which resulted in prejudicing and poisoning the mind of P. H. Pringle, her son, against respondent to the extent that he lost his love and affection for her. It is the well established rule that a verdict on conflicting evidence will not be disturbed on appeal. (*State v. Snoderly*, 61 Ida. 314, 101 P. (2d) 9.) Moreover, it is the function of the jury to pass upon the weight and credibility of the evidence. (*Manion v. Waybright*, 59 Ida. 643, 86 P. (2d) 181.) In considering the evidence this court must accept the evidence most favorable to the verdict, giving every reasonable inference and intendment in support of the same, and if more than one reasonable conclusion or inference can be drawn, to accept the one sustaining the verdict. (*Evans v. Davidson*, 58 Ida. 600, 77 P. (2d) 661.) It might here be well to observe that the rule is:

"It is no defense that defendant's conduct was not the sole cause of the alienation or separation; it is sufficient if his conduct was the controlling cause, although other matters contributed." (30 C.J. 1125, sec. 982.)

"It follows that wherever there is a conflict in the evidence this court may only review the testimony for the purpose of determining whether or not there is any substantial evidence in the record to support the verdict of the

jury, and must accept the evidence there found as true, unless that evidence is so inherently impossible or improbable as not to be entitled to belief." (*Wallace v. Wallace,* 85 Mont. 492, 279 P. 374; see also *Worth v. Worth,* 51 Wyo. 488, 68 P. (2d) 881.)

It was within the province of the jury in considering the evidence as a whole to take into consideration circumstantial evidence, if any, produced during the trial which showed or tended to show that appellant, maliciously, systematically and continuously influenced her son, whereby his love and affection for respondent was alienated. The fact that 'evidence in action for alienation of affections is circumstantial does not impair its usefulness nor deprive it of its potency. (*Wallace v. Wallace, supra; Moelleur v. Moelleur,* 55 Mont. 30, 173 P. 419.) It was for the jury to determine whether or not respondent had established by a preponderance of the evidence, whether direct or circumstantial, that appellant's conduct was such as resulted in undermining and ultimately alienating the affection P. H. Pringle previously had for respondent, and that such acts and conduct on appellant's part were malicious, intentional, and in furtherance of a well defined scheme or plan which ultimately resulted in the separation of respondent and P. H. Pringle, her son.

When the facts and circumstances disclosed by the record are carefully considered, we cannot say there was not sufficient, competent and substantial evidence to support the verdict.

Appellant strenuously urges that the court erred in giving and refusing to give certain instructions. Upon oral argument, much stress was placed upon the court's instruction No. 12[1]. It is conceded that "the court correctly instructed as to the presumption of good faith on the part of a parent but when it touched upon the overcoming of

---

[1]"You are instructed that although the marriage of a child does not terminate the right of a parent to interest herself in a child's welfare or happiness, and that such parent may cause a breach in marital relations for good cause and in good faith, and that the law presumes that the advice, acts and conduct of a parent towards a child is in good faith, such presumption may be overcome by evidence that the interference on the part of such parent is unwarranted, without excuse or reason, or induced by improper motives."

that presumption it permitted the jury, without any guide, to determine what advice or actual conduct was 'unwarranted, without excuse or reason, or induced by improper motives.' " It is further contended "the jury might have believed that the appellant's conduct was unwarranted—that would be a matter of judgment which might not have any relation whatever to malice." The gist of appellant's contention is, if we understand it, that "the presumption is not overcome excepting by evidence which shows malice," and that the use by the court of the word "unwarranted" justified the implication that a determination of the case could be made by the jury irrespective of the question of malice. When we read instructions Nos. 12, 11[2], 7[3], and 6[4], together and as a whole, we perceive that the court definitely instructed the jury that the presumption of law that the parents have a right to be interested in the affairs of their married children and advise them regarding such affairs, must be overcome by competent evidence, and it must be shown that the parent *acted maliciously and with intent to alienate the affections of the child*. Or in other words, that respondent could not recover in the face of the presumption of law stated, unless by competent evidence she established the fact that appellant acted maliciously and with intent to alienate the affections of respondent's husband. The court not only defined malice as a necessary element to overcome the presumption of good faith but further advised the jury as to the way in which such malice should be proved (i.e., by direct evidence of evil motive or intent or indirectly by inferences to be drawn from other facts and circumstances.)

[2]"Parents have a right to be interested in the affairs of their married children, and to advise them regarding such affairs. The law presumes that the parents in advising their married child have acted honestly and with good intention under the influence of natural affections and for what the parent believed to be the real good of the child. The plaintiff in a suit against a parent upon a charge of alienating the affections of a child, must overcome this presumption of law by competent evidence and show that the parent acted maliciously and with intent to alienate the affections of the child, before being entitled to recover."

[3]"You are instructed, gentlemen, that malice may be proved by direct evidence of evil motive and intent, or indirectly by legitimate inferences to be drawn from other facts and circumstances."

[4]"You are instructed that 'malice' in the law signifies a wrongful act done intentionally, without just cause or excuse."

We think that the discussion of No. 12 amply disposes of No. 13.

We are not constrained to hold instructions Nos. 20 and 21 are prejudicially erroneous. (*Dwyer v. Libert*, 30 Ida. 576, 167 P. 651.)

Instructions Nos. 22 and 23, complained of, find support as being correct and not prejudicial in 30 C.J. 1139-40.

■ Coming now to assignment of error No. 2, namely: "The verdict of the jury was made under the influence of passion and prejudice and is excessive, both as to actual damages and punitive damages." Respondent contends that this assignment cannot be considered on appeal from the judgment in the absence of a motion for a new trial based upon that ground, and cites in support thereof the following authorities. (*Ellis v. Ashton & St. Anthony P. Co.*, 41 Ida. 106, 238 P. 517; 3 Am. Jur. 131, sec. 399; 3 C.J. 739, sec. 781; 4 C.J.S. 747, sec. 339; and many others. This exact point has been definitely decided in this jurisdiction contrary to counsel's contention and authorities cited in support thereof. (*Buster v. Fletcher*, 22 Ida. 172, 125 P. 226; *McKinlay v. Javan Mines Co.*, 42 Ida. 770, 248 P. 473; *Herrick v. Breier*, 59 Ida. 171, 82 P. (2d) 90; *Luther v. First Bank of Troy*, 64 Ida. 416, 133 P. (2d) 717.)

The verdict awarded in respondent's favor was $35,000 actual damages and $15,000 exemplary damages. The record supports, we think, the conclusion that appellant was worth approximately not less than $300,000, and that respondent at the time of her marriage to P. H. Pringle, owned a small residence in Sacramento, which she sold, proceeds being expended in farming operations of her husband and herself. The exact amount received as specified in the settlement agreement is not altogether clear but the inference we think may be indulged that it did not amount to the sum received for the sale of the residence property. The court in its instruction No. 24, in effect, instructed the jury that if respondent and P. H. Pringle had entered into a property settlement agreement which had been approved by the district court in the decree of divorce awarded to respondent and if the verdict should be for respondent, in assessing damages they would not be entitled to take into consideration, or make any award for, the loss by respondent of support and maintenance by her husband. That a decree of divorce was granted to respondent against her husband P. H. Pringle, on the ground of cruelty, and that

a property settlement agreement was entered between respondent and P. H. Pringle and approved by the district court in its decree of divorce is established by the exhibits. The court in its instruction No. 25, said:

"You are instructed, gentlemen of the jury, that the fact that a husband and wife have entered into a property settlement does not preclude the wife's right to recover in an action of this kind from a third person for alienating the affections of her husband."

In instruction No. 26, the court said, *inter alia*:

"* * in determining the amount of actual or compensatory damages to be allowed plaintiff, you have the right to take into consideration that a wife is entitled to the conjugal fellowship, protection, affection and society of her husband, and it is your duty to award her damages in a sufficient amount as you may deem just and proper to compensate her for the loss of these, as well as for the humiliation and suffering inflicted upon her not exceeding $50,000.00.

"* * * if you find from the evidence that the plaintiff is entitled to recover actual or compensatory damages in any amount, and you further find from the evidence that the defendant's acts were wanton, malicious or gross and outrageous, or that the facts in this case are such as to imply malice and oppression on the part of the defendant, then you have the right to award to plaintiff, in addition to such actual or compensatory damages which you may find from the evidence she is entitled to receive, exemplary or punitive damages not exceeding $25,000.00, but in the event you find from the evidence that the plaintiff is not entitled to recover actual or compensatory damages, then in that event you have no right to award to plaintiff any exemplary or punitive damages."

From the court's instructions it is clear that the jury was instructed to award respondent no damages for loss of support and maintenance by her husband, but to limit the verdict for damages to actual damages and exemplary damages by reason of the alleged wrongful, malicious acts of appellant.

In considering the question of the damages, the jury was at liberty to take into consideration the future probability that, upon appellant's death, there being but two heirs, respondent's husband would receive by inheritance one-half of her estate, or approximately $150,000, in which respondent would have a contingent interest with her

husband. They were also at liberty to consider the loss of consortium, because:

"The gist of the action for alienation of affections is the loss of consortium. (30 C.J. 1123, sec. 977.) This is a property right growing out of the marriage relation, for loss of which recovery may be had, and includes the exclusive right to the services of the spouse (which contemplates not so much services or reward earned as assistance and helpfulness in the relations of conjugal life according to their situation) and also the exclusive right to the society, companionship and conjugal affection towards each other. The plaintiff is not limited to a recovery of damages measured by the loss of consortium down to the date of the commencement of the action, but is entitled to damages measured by the permanent loss of the spouse's aid, comfort and companionship. (30 C.J. 1148, sec. 1026.) In addition to such injuries and loss, recovery may be had for mental and physical suffering, as well as injuries to character, feelings or reputation. (30 C.J. 1149, sec. 1026; 13 Cal. Jur. 905, sec. 88.) Conceding that it is a difficult task to determine what is a just and reasonable compensation and that it may not be possible of exact ascertainment in actions of this character * *." (*Riggs v. Smith*, 52 Ida. 43, 49, 11 P. (2d) 358.)

where such damages are substantially proved as in the instant case, that is, loss of consortium, mental anguish, physical suffering and humiliation, as well as injury to character, feelings and reputation, we resort to the general rule, which is that the amount of damages is peculiarly for the jury to determine under all the facts and circumstances of each particular case, and in the absence of abuse of discretion the verdict will not be disturbed. The presumption being that the jury, after hearing all testimony and receiving the instructions of the court with reference to the amount of damages, took into consideration all of the elements of damages set out in the instructions of the court. (*Maw v. Coast Lbr. Co.*, 19 Ida. 396, 416, 114 P. 9; *Maloney v. Winston Bros. Co.*, 18 Ida. 740, 111 P. 1080.)

As pointed out in *Geist v. Moore*, 58 Ida. 149, 70 P. (2d) 403, there are two types of cases where this court will take action because of the excessiveness of the verdict. One, where "it is apparent that the error has occurred through a miscalculation of the jury or a misconception by

it of the basis on which the calculation should be made." The other, "where the only apparent reason for the excessive character of the verdict is that it was the result of bias, prejudice or passion." This court, speaking through Justice Givens, in *Luther v. First Bank of Troy*, supra, said:

"While the amount of damages is peculiarly for the jury to determine under the facts of each particular case, this court can nevertheless determine whether or not the damages are so large as to indicate the influence of passion and prejudice in the verdict. If the verdict is excessive but does not indicate such influence of passion and prejudice as to taint the entire verdict, that is, indicate that the rendering of any verdict against the defendant was because of passion and prejudice, merely that the verdict is excessive in amount, this court has reduced the amount, making its acceptance optional. [Citing cases.] * * * If, however, passion and prejudice evidently entered into the jury's deliberations not only as to the amount of the verdict but as to contributing to its returning any verdict at all, the verdict is vitiated and the only constitutional protection is to grant a new trial. [Citing cases.] * * *."

If we understand the ultimate conclusion reached in the foregoing opinion it is held that where it appears that the damages are so large as to indicate the influence of passion and prejudice in the verdict a new trial will be granted. If it appears that the verdict is excessive but passion and prejudice are not indicated, the court will reduce the verdict to the amount supported by the evidence making its acceptance optional.

In *Cox v. Northwestern Stage Co.*, 1 Ida. 376, 385, it was contended that the verdict was excessive by reason of passion and prejudice of the jury. In the course of that opinion the court said:

"We do not see by what rule we are to say that the jury were influenced by passion or prejudice. Does not the fact that they might have found a verdict for five thousand dollars more than they did, completely answer any presumption of that kind? * * * Nothing appears from which we can infer any such fact, except the mere assertion of defendants." Cited with approval in *Nelson v. Johnson*, 41 Ida. 697, 243 P. 647.

In *Horn v. Boise City Canal Co.*, 7 Ida. 640, 645, 65 P. 145, this court refused to disturb the verdict on the ground

that it was influenced by passion and prejudice and used the following language, quoting in part from American and English Encyclopedia of Law, 2nd edition:

" 'The real question in all these cases is not whether the amount of damages awarded by the jury is more or less than is, in the opinion of the court, proper, but whether it is shown that the jury have abused the discretion vested in them.' While it appears to us that the verdict of the jury is for rather a large amount for the injury received, yet under the evidence in the record, which we have carefully examined, we do not feel authorized to disturb the verdict upon the ground that the jury has abused the discretion vested in it, or that the jury has given an excessive verdict for damages while acting under the influence of passion or prejudice."

In *Marckwardt v. Hayworth,* 127 C.A. 738, 16 P. (2d) 328, the following language is used:

"Appellant's final complaint is that the damages awarded to respondent are excessive. In order that this objection may be efficacious, it must appear that the judgment is 'so plainly and outrageously excessive as to suggest, at the first blush, passion, prejudice or corruption on the part of the jury'."

In *Mohn v. Tingley,* 191 Cal. 470, 217 P. 733, in the syllabus of that opinion it is said:

"Appellate courts are not concerned with question of preponderance or substantial character of evidence, but only as to whether there is any evidence tending to support a verdict."

In that case a verdict for $100,000, was awarded by the jury for alienation of a husband's affections, and that court said: "while the verdict in this case is very large, we cannot say under the evidence that it is so excessive as to suggest, 'at the first blush, passion or prejudice or corruption on the part of the jury'."

No particular uniformity exists in the cases awarding damages for alienation of affections, but the analysis of the following justifies us in reducing the verdict and judgment herein as excessive: in *Marckwardt v. Hayworth,* supra, $15,000 was reduced to $7,500; in *Fitzpatrick v. Clark,* 26 C.A. (2d) 710, 80 P. (2d) 183, $30,000 was reduced to $22,500; in *Jones v. Jones,* 96 Wash. 172, 164 P. 757, $25,-000 was reduced to $12,500; in *Thompson v. Thompson,* 166 Wash. 270, 6 P. (2d) 617, $7,500 was reduced to $2,500

(over half) ; *Clark v. Orr,* 127 Fla. 411, 173 So. 155, $25,000 was reduced to $5,000 (a four-fifths reduction) ; *Hendrick v. Biggar,* 136 N.Y.S. 306, $75,000 was reduced to $30,000 (over half) ; *Smith v. Smith,* 192 Mich. 566, 159 N.W. 349, $12,000 was reduced to $6,000; *Heisler v. Heisler,* Iowa 127 N.W. 823, $7,000 was reduced to $2,000 (reduced over two-thirds) ; and in *Warren v. Graham,* 174 Iowa 162, 156 N.W. 323, $4,875 was reduced to $2,000 (over half).

It is thus apparent that courts have not considered that a reduction of more than half of the original amount was unauthorized as showing bias, passion, or prejudice demanding a reversal rather than reduction.

Accordingly, the judgment will be affirmed in the amount of $20,000 compensatory damages and $1,000 punitive damages on the condition that the respondent within thirty days of the going down of the remittitur accept such reduction and the judgment so modified. On failure to do so, the judgment will be reversed in toto and a new trial granted. (*Kinzell v. Chicago etc. Ry. Co.,* 33 Ida. 1, 190 P.255.)

Costs to respondent.

Holden, C.J., and Givens, J., concur.

AILSHIE, J., (Dissenting).—It is an established rule in this court, that verdicts will not be disturbed where there is substantial evidence, though disputed, to support the verdict. This is upon the theory, that the jurors see and hear the witnesses testify and are in better position to determine their truthfulness and the weight to be given their evidence. It must be remembered, however, that seeing and hearing witnesses *can not supply an absolute lack of evidence.* Furthermore, in determining the sufficiency of the evidence to support a verdict, it is not enough to merely accept the testimony of the successful party alone; but the *undisputed* and *admitted* facts disclosed, whether proven by the *plaintiff* or *defendant,* should be accepted and considered together by the appellate court in arriving at a conclusion as to whether the evidence as a whole supports the verdict. Surely we can not take the plaintiff's complaint and her *narrative statement* and omit her *admissions on cross-examination* and likewise omit and disregard the *admissions and undisputed testimony of her own witnesses.* Neither should we disregard the undisputed testimony produced by the adverse

party. All admitted and undisputed testimony should be considered together.

The constitution of this state declares that "right and justice shall be administered without sale, denial, delay or prejudice." (Sec. 18, art. 1, Const.; *Day v. Day*, 12 Ida. 556, 86 P. 531, 10 Ann. Cas. 260.) After a very careful examination of the entire record in this case, I am convinced that justice "without prejudice" has been denied appellant.

It must be remembered that this is an action for alienation of conjugal affections. The measure of damage in such case should be largely controlled, not merely by the size of the defendant's purse, but by the character and nature of the marital relation which existed and is claimed to have been disturbed or severed. The bulk of some 487 pages of this record, exclusive of 59 exhibits, is devoted to arguments and differences between mother and son over *farming operations* and attendant problems, rather than over his relation to his wife. In parts, the record might very well indicate to one, who did not know the nature of the pleadings, that the evidence was directed toward establishing grounds for divorce and alimony; and very little of it is devoted to the actual *marital relation* existing between respondent and her husband or the manner in which appellant caused any interruption or severance of the conjugal status.

When this couple were married in California (April 11, 1937) respondent, 24 years old, was engaged as a general manager of the business concern where she had been in charge of employees and operations for some four years; while young Pringle, then 27 years old, something over four years out of Stanford University, in the meanwhile had been, for four years, an apprentice in mechanical engineering with the Southern Pacific Railroad Company. His apprenticeship expired in November, 1938. His "seniority" was not such as to entitle him to continued employment by the company, which was laying off men; and he began looking for other employment. His mother (appellant), having several good farms in Twin Falls County, Idaho, young Pringle conceived the idea of going into the farming business and accordingly wrote his mother, stating his plans and wishes in that respect. The mother was a practical business woman, having been the wife of a successful farmer (deceased) and evidently well-familiar with all the details of farming in that section, and with the qualifica-

tions and education of her son as well, and did not think it a good idea for him to undertake farming and so informed him. She pointed out the fact that he was educated for an engineer; that he was unprepared for and unfamiliar with farming and that he was not equipped for that work. He insisted, however, on taking one of his mother's farms, his wife agreed to it and they came to Idaho and selected the farm they wanted to take and entered into a lease with his mother (appellant) for a year, on the same terms and conditions as other farms were leased to tenants, the mother telling him at the time that he should conduct the business as a tenant, in a businesslike way, on the same terms and conditions as she rented farms to others; and that if she had *anything to give* him, she would do so outright; and his leasehold business must be conducted on a strictly business basis.

The residence on the place Pringle and his wife selected was not in a very good state of repair. It required considerable expenditure to make it habitable. Appellant accordingly had new plastering done, hardwood (white maple) floors put down, and the rooms decorated; and when completed, the house appears to have been a very comfortable and commodious place. Appellant advanced some $4,200 for the purchase of machinery, farming implements and equipment and deposited $1200 in the bank to the credit of Pringle's personal account. This latter sum was deposited on the eve of appellant leaving for California (Dec. 20, 1938), to visit her daughter in Los Angeles, and upon her return, some two months later, she found the bank account depleted and advanced another $1,000.

Admittedly, respondent knew nothing of farming, having had no experience of any kind in that line. Realizing the inexperience of her son and his wife in reference to farming and agricultural pursuits, she frequented the place from week to week, looking over and inspecting the work and discussing with her son the things that should be and those that should not be done, a *right reserved to her by the terms of the lease.* Both being rather positive characters, the mother and son frequently disagreed and sometimes quarreled over whatever subject they might be discussing. The son would go home at noon or night, as the case might be, in a bad humor and evidently at times told his wife of the disputes; and she doubtless took his view, and so things drifted along without anything personal occurring other than the differences and discussions as aforementioned.

Respondent appears to have been of a very suspicious nature and, knowing that her mother-in-law was not particularly fond of her, she thought every time the mother-in-law and son had a discussion about the farming operations or an altercation of any kind, it was about her, which the record clearly shows was not the case. In the meanwhile, respondent and her husband were, and had been ever since their marriage, having minor periodic differences and disputes over one thing and another, of a rather inconsequential nature, one of which was his complaint that she was drinking too much; that she had gone out with someone in California and that she had too much to drink and "got tight." Another was his charge that she drank too much liquor with a sheepherder in Kimberly. She admitted having a drink with the sheepherder but denied that she was drunk. Although the mother-in-law was nowhere near and apparently neither knew of nor had anything to do with these incidents, they are related at great length in detail on the witness stand, on the theory that they were corroborating circumstances of alienation of affections; all of which is too remote from the nature of this case to merit serious consideration. However, it is claimed by respondent and admitted by Pringle, that he gave her a couple "spankings" on account of her alleged escapades; and they, too, seem to be charged to appellant, although there is no word of evidence whatever to substantiate the claim. Nevertheless, it is undisputed that as soon as appellant learned that her son had struck his wife, appellant went to him and asked him for the truth about the matter and gave him a lecture over it and told him at that time: ". . . if I ever heard of him striking her again I would disown him." That account and conduct certainly can not be, by any quirk of imagination, construed into an attempt or desire to alienate the son's affections for his wife. On the contrary, it was calculated to increase his respect for his wife and remind him of his marital and honorable duty to her.

The most serious and climactic act, which is dwelt on throughout the case, occurred in the autumn of 1939, during the harvesting season of beets and potatoes. The son was taken quite ill one afternoon and appellant was called and told of the situation and asked to come out to the place. In the meanwhile a doctor was called, came and made a diagnosis of the case, and while he does not testify in the case, the nurses say he diagnosed the case as pneumonia.

The mother came out, saw her son in bed, talked with him and, according to the nurse's testimony, she said she did not believe it was pneumonia. An argument and dispute arose between appellant and the daughter-in-law, which resulted in the mother-in-law being ordered out of the room. The incidents of that occasion, because of its being the only incident of any material consequence in considering this as an *alienation* case, are set out at some length as follows:

Appellant described the incident thusly:

"And at that time she asked the nurse or appealed to the nurse to have me leave the room. The nurse said: 'Yes this is my patient; I will have to have quiet. If you are going to be noisy,' or something like that—I don't know just what she said, that she would have to ask us to go . . . She acted very nice; the nurse did. I turned around and I remember saying to Gertrude: 'Young lady, this is one time you have gone too far,' and I walked out. Mrs. Read followed and Gertrude and then Harold called Mrs. Read back. And I went down stairs and I think Gertrude stayed there. I think she stayed to find out what Mrs. Read had said . . . There wasn't anything spoken or a thing spoken about disinheriting him at all . . . No, the only thing I said was: 'Young lady this is one time you have gone too far. . . . the only time I ever threatened him was the time I told him if he struck her again I would disown him. I never used the word 'disinherit.' "

Respondent described it as follows:

"Well Mrs. Pringle came into the room and she told Harold that she didn't believe he had pneumonia; she just couldn't believe it . . . she told me that I had no business getting a doctor; I had no business hiring nurses; that I was entirely too extravagant with her money . . . She told my husband that if he got well he would have to leave the farm because she was not going to let me stay there any longer . . .

"Q. Did she say anything further? A. Yes, 'And if you don't get rid of her I will disinherit you.' . . . And then the nurse ordered her out of the room."

Respondent's husband related the incident in this way:

"Q. During the time that you were ill, in any of the conversations out there in which your mother—in which your mother was present, did she say anything about disinheriting you? A. No.

"Q. Or refuse to let you stay on the place; remain there on the farm? A. She said something to that effect . . . she finally told me we would have to move that fall . . . it was the trouble with mother and I. It had nothing whatsoever to do with Gert."

Mrs. Read testified as follows:

"Q. Were you there at all the times that Mrs. Pringle was that morning in the sick room? A. Yes . . .

"Q. You heard some testimony here to the effect that Mrs. Pringle said to Harold: 'You will have to get rid of that woman or I will disinherit you, or cut you off.' . . .

"A. No, nothing like that took place.

"Q. Nothing like that was said by Mrs. P. J. Pringle at that time? A. No."

Marie Wullschleger, the nurse in charge at the time of Pringle's illness, testified:

"... I asked Mrs. Pringle Sr. to quiet down. I said: 'This is no place for an argument and if you don't stop that argument you will have to leave the room.' . . . Mrs. Pringle Jr. said: 'If we are going to argue let's go down stairs.' Then Mrs. Pringle Sr. said: 'I want you to know I am through with you.' to Mrs. Pringle Jr. and: 'I don't ever want any more to do with you.' She started to leave the room and turned to Harold and said: 'If you don't get rid of that woman you will never get a penny of my money, because I will disinherit you.' Then they left the room."

Whatever his ailment was, he remained in the house for five days and on the 7th day was in the field directing his farming operations.

Now, assuming for our present purposes, that appellant told her son: "If you don't get rid of that woman, you will never get a penny of my money because I will disinherit you," the correctness of which assumption may well be doubted, it must be conceded that she was carrying her threat too far. She had an undoubted right to disinherit her son if she desired to do so, for any reason or no reason, but certainly had no right to make an inheritance dependent upon her son abandoning his wife. In other words, as I conceive the law to be, a parent has a right to disinherit any member of his or her family, with or without reason, but to make doing so dependent upon the breaking up of the child's family as a condition precedent, is wrongful; and if, as the result of such threat, the marital ties were broken,

then such wrongful conduct would be actionable. However, in the consideration of such facts and the resultant severance of marital ties, there should be taken into account the fact, that the affections of a husband, who yielded to such threat, are not very stable, durable or of great value.

The contention that, as a result of this alleged threat and controversy, respondent lost a share in the prospective inheritance of her husband from appellant's estate, seems too remote and contingent and without merit. It is dependent upon too many contingent contingencies. In the first place, had they continued to live together until after the death of appellant, any estate respondent's husband might have acquired, by either will or succession, would have been his separate property. (Sec. 31-903, I.C.A., amended and sec. 31-906, repealed, '41 S.L., p. 123) in which respondent would have had no interest except as her husband might have spent it from time to time for their joint and mutual benefit; and the possibility of her husband inheriting from his mother and *respondent then inheriting from her husband* is *too remote and contingent* to merit consideration in an action of this kind. Other contingencies might well be enumerated.

Another point dwelt on by respondent is an incident wherein Pringle (the husband) blacked respondent's eye. It occurred over a gun play made by respondent at their residence. It is admitted that she got a revolver and that in the process of her husband taking the gun from her, it was discharged and the bullet went through the ceiling. She claims that she got the gun for the purpose of *committing suicide* and he claims that she got the gun for the purpose of *shooting him* and had it pointed at him.

Their respective statements, as to the occurrence of this incident, are as follows:

Respondent testified:

"Q. Now then from the time of your marriage to Harold Pringle when did you and your husband first have any difficulty or trouble? A. *About a week after he had taken ill with pneumonia.* He was just up.

"Q. Now then what happened at that time with respect to the presence of the defendant, Mrs. Pringle; was she there or had she been there prior thereto? A. She had been there.

"Q. And when had she been there with respect to the time of that controversy or trouble?

"A. She had come out in the morning and she and Harold had quarreled, and after she left Harold came into the house and accused me of causing him to be disinherited.

"Q. And when did he make that accusation with respect to the time of the visit of his mother? A. Immediately after she left.

"Q. Now then just relate to the jury as near as you can remember what happened there on that occasion; what did Harold say and do? [Objection to this.]
. . . .

"A. I was about to say, that is the occasion I tried to tell you about yesterday when you objected. That took place after my husband, Harold, had had pneumonia in October . . . a morning when he had been working in the field and his mother had been out to the farm . . .

"Q. You mean that you were drunk there? A. I do not mean that.

"Q. That's all I have been asking you about; isn't it a fact on that occasion you went up stairs and got a pistol and went down and pointed it at your husband?

"A. That is not true.

"Q. And told him you were going to shoot him?

"A. That is not true.

"Q. Isn't it true that he walked up to you and grabbed your wrist and you pulled the trigger and it shot through the ceiling? A. *I had the gun intending to kill myself* and he grabbed the gun and it went off . . . We never kept it up stairs . . . It was in the dining room closet hanging in a shoulder holster that my husband wore. I was standing to the right of the dining room table on the right hand side of the room. *About half way from the bottom of the steps to the other end of the room* . . .

"Q. And where was the closet you got the gun?

"A. It was along side of the stair case.

"Q. How far from where you were standing when the gun was discharged? A. Perhaps six feet. I am not sure about that; that's a guess."

Pringle's testimony is as follows:

". . . it wasn't long after I got sick in the fall of 1939. I come to the house and Gertie was pretty tight again. She had been drinking with a man by the name of Bell who was herding sheep . . . we had a pretty big word battle. *She*

*went upstairs and come down and she had the gun in her hand.* I was laying on the davenport at the time. She pointed it at me and said: [swearing] 'I am going to shoot you.' I kind of talked to her. She could shoot pretty good too. I was highly uneasy. I talked to her a little bit . . . It was across two rooms; . . . As she was standing on the stairs and pointing that gun at me, she was pretty wild talking like a blue streak. And every time I could drive a word in that I thought would quiet her I did it and I kept getting closer and closer and I could see her tighten down on it, and I grabbed her hand and pushed it around and she fired the gun in the ceiling as I tried to get the gun away from her . . . some way or another she got her eye blacked in the scuffle; . . . I got the gun away from her and then she began to fight and one thing and another, claw and strike and throw things. I got tired of that right quick and *I was scared anyway and I just turned her over my knee and gave her another paddling.*"

While this was a proper subject for the divorce court to consider, it certainly was not chargeable to appellant. There is no shadow of evidence, that appellant induced or connived with her son to either kill, abuse, or do violence to his wife; while, on the other hand, it is undisputed that she threatened to disown her son if she ever heard of him beating or doing violence to the person of his wife. Certainly this incident could not in any manner be chargeable to appellant as an *act of alienation* of her son's affections for his wife.

It is inconceivable to suppose, and there is no evidence to support it, that the mother wanted to injure her son or cause his death; nevertheless, the gist of the undisputed evidence throughout is to the effect that her quarrels with her son were over his method, or lack of method, in conducting his farming operations. The wife (respondent) just didn't like the mother-in-law and the feeling was evidently mutual. They were radically unlike. No where is there a word of evidence disclosing any *malice* either one entertained for the other. Nowhere is there a word of evidence that appellant desired, or attempted, to injure respondent for the gratification of anger, jealousy, hatred, or revenge, or the like; and the same is true with reference to the feelings of the daughter-in-law for the mother-in-law.

Malice, in the sense in which it must occur in such a case as this, is a deliberate intention to do evil.

"Malice: 1. A disposition or intent to injure another or others for the gratification of anger, jealousy, hatred, revenge, or the like; active malevolence.

"2. A deliberate intention to do evil with or without personal ill will." (Funk and Wagnalls Stand. Dictionary; Webster's International Dictionary; Oxford Dictionary; *Klam v. Koppel,* 63 Ida. 171, 118 P. (2d) 729, 735; *Dwyer v. Libert,* 30 Ida. 576, 167 P. 651; *Luther v. First Bank of Troy,* 64 Ida. 416, 133 P. (2d) 717.)

We find no single bit of evidence or circumstance, either proving or tending to prove, that the appellant entertained any feelings of anger, hatred or revenge against respondent; and we are certainly not permitted, under the plainest principles of law and justice, to *assume* that any such state of mind existed.

*Dislike* is one thing; *malice* is quite another. There is no law against one person disliking another; and entertaining or expressing dislike for another is not actionable. On the other hand, entertaining malice and carrying it into execution is actionable. "Dislike" is variously defined as "disapproval"; "contrary feeling to like or affection", "disapprobation, aversion, antipathy." (Webster's Internal. Dic., Funk & Wagnalls Stand. Dic., Oxford Dictionary.)

A number of small and trivial incidents in everyday life occurring throughout a period of three or four years (as herein), when accumulated and huddled together in a single statement, may easily be magnified to appear ominous, dastardly, or unlawful, but when considered and viewed, each alone in its own proper time, place and setting, is but little, if at all, more than ordinary incident to the general common run of human life, conduct and intercourse. It is not enough to simply throw them all together and charge them up to evil or malicious design; whereas, they may more likely have arisen spontaneously out of the immediate subject then in hand and submerged as quickly.

It deserves note and mention here that, while appellant and respondent were necessarily coming in contact with each other from time to time under a kind of "armed truce," there was another mother-in-law "adding fuel to the flame." Respondent was in regular correspondence with her mother in Placerville, California, and the latter was writing quite frequently; and in her letters she was referring to appellant in many ways other than in complimentary terms, calling

her such names as the "battle ax," "tabby," etc. Excerpts from her various letters follow:

"So C. is sno*p*ping around let her *snop* the battle ax";

"to bad C is so d——m nasty about *her money* what does she intend doing with it.

"I thought if you went back there to live you were to be Mrs. Pringle and not a slave like she said she was, just a little trick of the old girl."

"So C. is coming home I hope she stays in her own place and leaves you alone don't let her get away with anything, I wish she would take a trip around the world, and forget where she lived.

"I bet her husband had a lovely life with that old tabby . . ."

"To bad Clara makes you pay her. What does she intend to do with her money she ought to give it to you kids to start you out in life but I suppose that is the way they got it, to *ptinjy* but it does not do them much good."

For good measure, the father dipped in a time or two and one of his letters, referring to the "mighty Pringles", said:

"It does seem strange to me that the high and mighty Pringles would allow you to be reduced to the necessity of writing to your folks for the necessities of life. It is evident to me that the Mrs. P. will not be satisfied untill you are crawling in the dirt."

This in the face of more than four thousand dollars advancements.

So, it can be seen that a general mental warfare was being waged by respondent and her parents against appellant, chiefly on the ground that they just didn't like her, the "old tabby" and to accentuate their dislike, they couldn't forget that she had money and property and was not giving it away as largely and freely as they thought she should.

That brings us to the question as to just how liberal appellant had been with her son and daughter-in-law. The exhibits in this case show that appellant drew checks in favor of her son, P. H. Pringle, in the aggregate sum of $4,665.35 between April 15, 1937 (four days after their wedding) and February 19, 1940. This sum was furnished in addition to payment by appellant for farm machinery, farming implements, tractors, a cow, and a span of horses; an amount in excess of $3,872.70.

Thus it will be seen that appellant, in the course of two years and ten months, laid out and expended in excess of $8,538 for the maintenance of this "young couple" and to enable them to equip and carry on their farming operations. That does not read like the economy of a "stingy" miser, or heartless mother in financing a 27-year old son and wife in operating a 160-acre farm. Nevertheless, in the face of these gifts and advances, appellant was yclept by respondent's mother as a "tabby," "battle ax," and other uncomplimentary descriptives, while respondent's counsel in their brief brand her as "diabolical", with a "black and malignant heart", and as having "subjected respondent to the cruelties of a Spanish inquisition"; that she had "reared her son in a home where the almighty dollar was worshipped as God."

Conditions remain very much the same between respondent and her husband, interspersed with disagreements and broils from time to time, until May, 1940, when respondent's parents came up from California in response to her request. They came out to the farm and later went to Twin Falls. On May 25th while her husband was at work, respondent left a note for him, reading as follows:

"Dear Harold:

Please forgive me for this last thing that I've done it seems to only way for both of us.

I am inclosing the house check.

Hazel will pack for me if it is O. K. with you.

Always

Gertie",

and departed with her parents for California and never returned to her husband. The evidence is undisputed that Pringle was considerably worked up and distressed over his wife's deserting him and he made strenuous efforts to accomplish a reconciliation, as evidenced by the following communications which he addressed to her and she received at Placerville, California, only the first of which she ever answered:

Date of cancellation on envelope, June 10, 1940.

"June 9

Dear Gertie :-

I received your letter saying that you were in Placerville, I have waited before writting this letter to let you have

time to make up your mind what you are going to do and to get settled. I never sent you the ring as I would like to give that to you personally; I have no use for it and if we can bring our business to a close without any more trouble or hard feelings I would like to give the ring myself. The chance is that you never want to see me again.

You know our business as well as I do and what property that we have; we will have to settle that. I would like to know what you think you should have. We both have had too much trouble to cause one another any more so in that case I will try to be fair with you as I know how and I trust you will do the same to me. I have tried to send you your personal things although I expect there is still some of them left here and if you will tell me what they are I will see that you get them. The quicker we can get these things settled the quicker we will be able to start life where we left off. We did not make the grade and so we both will have to find another path to lead.

I hope you do not bear me too much malice.

Yours truly

Harold"

Date of cancellation on envelope, Aug. 5, 1940.

"Sunday night

Dear Gertie:-

I wrote you a letter quite a long time ago and it was never answered or returned and I am afraid that you never received it. After all one does not live three years with another and then leave with never a word.

I do not know what you think of our separation whether you think that we could make it if we tried again or just quit as things are. In event that we let things drop here and now we should settle our business affairs. If we don't settle them it will be a source of annoyance to both of us. I looked up the devorce laws of Calif. and it will take you two years to get a devorce. One year to establish residence and one year for final papers. If you want me to go ahead I will but I will not otherwise.

I am going to leave the farm this fall as I do not have the heart to go on. It is no fun alone and all the dreams are knocked in a cocked hat. One has to work for some

one to make it fun and so I am going to quit. I have no idea what I will do after I leave here.

I beg of you to write and at least tell me how you are.

Yours truly

Harold

Please write to me.

P. H. P."

Date of cancellation on envelope, September 6, 1940.

"Monday night

Dear Gertie:

I got your letter some time ago and I have been thinking about it some. I left the way open for you to ask to try and get together again but you didn't and so I have to do it myself. I didn't want to for I didn't leave you and I figured it was your place but I guess that you either have more pride than me or else you have firmly decided to to stay gone.

I will come down and talk things over as soon as I can if you will give me the opportunity and I may come anyway. I am so lonesome that I will pocket my pride and everything else that has caused trouble between us if I can bring us back together. That is coming a long way toward a settlement I think but I guess I would do most anything that you ask with a very few exceptions. If you think that there is any chance of settling our quarrel I wish you would come just a little and help me.

I think that I can get a job in Bremerton Wash. or Mare Island. If not there I can get one some place else. I think that I can support you in fair style at least. I have made many mistakes and I will try never to make them again.— Don't you think that it is worth another trial after all I think that if we get away by ourselves that things might be a great deal different. I pray it is not too late for this letter for I guess I should have ask you monthes ago. Please lets try again or at least talk it over.

Love

Harold

xxx (Big ones)

Please answer in a hurry—Please.

PHP"

"Wednesday morning.
Sept. 18, 1940

Dear Monk :-

I wrote you a letter sometime back trying to see if we could not get together again, but I did not get an answer either way from you so I guess that you never got the letter. I will tell you again what I said before.

I think that I will go to Bremerton Wash. when I get cleaned up here and I wish with all my heart that you would come with me. However if you would object to that place I would try to find a job elsewhere.

It has been hard a I have been so awful lonsome that I am almost nuts. I wish you would try again and I think that we could settle all of our troubles. I am asking you this because I love you and I do not want to see our home broken for any cause if I can help it. I don't suppose it looked that way to you but that is neverthe-less the case.

I will try and get away and come down and see you, however I may not be able to do it. If things work out I think that I can get away for about four or five days in which case I am coming down. For my part I think that we could still work things out and have a happy life together.

                    Love

                              Harold"

It will be noted from the foregoing letters that Pringle urged and begged his wife to let him come and talk the matter over with her and that they make an effort to become reconciled to each other. He also proposed to leave Idaho and go somewhere else to set up a home and named different places where he thought he could get work. He suggested that "If we get away by ourselves, things might be a great deal different."

It seems clear from these letters, written after his wife had surreptitiously left him and while they were still husband and wife, that, if any impairment had been wrought in his affections for his wife, he still entertained conjugal affection for her and an earnest desire to take up again and continue their marital relations. Furthermore, he proposed to remove the domicile from Idaho to some place distant where they would be alone. This incident, instead of proving loss of affection for his wife, rather served to develop and demonstrate his better and more sin-

cere marital affection for and devotion to his wife. It persuaded him that, even though he didn't get along *with* her, he couldn't get along *without* her.

Respondent remained adamant to these importunities, solicitations and promises and her husband accordingly, thereafter, on the 5th day of June, 1941, filed a complaint for divorce, *charging desertion.* October 14, 1941, respondent filed her answer and *cross-complaint* in the divorce action, charging her husband with *cruelty* and praying for a divorce; and on the same date decree was entered, granting respondent a divorce on the grounds of *cruelty* and approving a property settlement made by the parties.

So it can easily be seen, from these foregoing circumstances, that respondent did not value very highly the affections of her husband—not enough to accord him an interview or to discuss their differences with him, or further consider living with him. At that time it was apparent that she did not consider she was losing much when she lost her husband. *She asked for the divorce.* Evidently the first realization of what she had lost was after she got her divorce and began working in a law office in Placerville, California, where in some way she conceived the idea that she had a cause of action against her quondam mother-in-law.

These recitals of evidence in the case are not made for the purpose of determining the sufficiency of the evidence to support a verdict and judgment of any amount whatever, but rather for the purpose of determining, (a) whether *malice on the part of appellant is shown* and, (b) for *the purpose of determining whether or not this verdict is in part or whole a result of prejudice, bias, or passion on the part of the triers of fact.*

A thorough and careful consideration of the whole case convinces me that, under the evidence as it appears in the record, a verdict for $35,000 damages and $15,000 punitive damages could not have possibly been returned except and unless it was prompted, (a) by prejudice and bias against the defendant; (b) or under a misapprehension of the law as given to the jury by the court; (c) or by something that appeared or occurred extraneous to the record. In any event, the verdict is so excessive and unreasonable as to leave no room for doubt in my mind but that it was the result of *prejudice, bias or passion.*

In *Luther v. First Bank of Troy,* (Ida.) 133 P. (2d) 717, 721, we said:

"If, however, passion and prejudice evidently entered into the jury's deliberations not only as to the amount of the verdict but as to contributing to its returning any verdict at all, the verdict is vitiated and the only constitutional protection is to grant a new trial."

*Thompson v. Thompson,* 166 Wash. 270, 6 P. (2d) 617.

So far as we are advised, the verdict in this case is more excessive than anything ever approved by this court even in a death case. In *Roy v. O. S. L. R. Co.,* 55 Ida. 404, 42 P. (2d) 476, the jury returned a verdict of $35,000 damages and this court ordered a reduction of $10,000 and affirmed the judgment in the sum of $25,000. In a footnote to Mr. Justice Givens' opinion in that case there is set forth a very exhaustive table of amounts allowed as damages in various damage cases.

In *Staab v. Rocky Mtn. Bell Tel. Co.,* 23 Ida. 314, 129 P. 1078, the court approved a judgment in favor of the widow and three minor children, for the death of the husband, in the sum of $15,000.

In *Graves v. Northern Pac. Ry. Co.,* 30 Ida. 542, 166 P. 571, the court approved verdicts and judgments in favor of the guardian of a minor, for the death of both the father and mother of the minor in the total sum of $12,000.

In *Manion v. Waybright,* 59 Ida. 642, 86 P. (2d) 181, the widow recovered judgment in favor of herself and minor children in the sum of $15,000, general damages, and in addition thereto funeral expenses.

In *Lebak v. Nelson,* 62 Ida. 96, 107 P. (2d) 1054, this court approved a verdict and judgment in favor of the guardian of three minor children for the death of their father, in the sum of $23,535.

In *Hepp v. Ader,* (Ida.) 130 P. (2d) 859, the court approved a verdict and judgment in favor of the husband and adult daughter in the sum of $10,525.

In *Kinzell v. C. M. & St. P. Ry. Co.,* 33 Ida. 1, 190 P. 255, this court reduced the judgment for damages from $35,000 to $25,000 and affirmed the judgment in the latter sum.

In *Neil v. Idaho & Wash. N. R. R.,* 22 Ida. 74, 103, 125 P. 321, the jury awarded a verdict of $35,000 for personal injuries to a railroad conductor. This court reversed the judgment and ordered a new trial, saying:

"The amount of the verdict is so excessive that it leads us to believe that it was rendered through prejudice and passion and without deliberation."

In *Denbeigh v. O. W. R. & N. Co.*, 23 Ida. 663, 132 P. 112, the jury rendered a verdict of $15,510 as damages for personal injury. This court reviewed the case and held the damages were excessive and ordered the judgment reduced to $11,510 and as so reduced affirmed the same.

Many other cases might be cited from this court, showing the damages awarded for major injury and death cases for much less than the verdict herein. I do not think it can be reasonably or successfully urged that respondent was entitled to recover more for the alienation of her husband's affections than she would be entitled to recover, had he met his death through the wrongful or negligent act of appellant.

The theory on which damages in this case have been claimed and apparently determined is, that if a rich man publishes and brands one as a deadbeat or a thief, others will believe the charge and the victim will be damaged in proportion to the wealth of the rich man; whereas, if the same thing be done and said by a man on relief, no substantial damage will be done because of his lack of wealth, standing and ability to respond in damages. That kind of philosophy and judge-made law has in substance received the approval of many courts, though not stated in such bald and crude terms as above. Nevertheless, however judicially and deftly stated, it seems to me not only faulty reasoning but is also downright immoral social doctrine and runs counter to every principle of equal justice to both rich and poor, great and small, as contemplated by the constitution and laws of the land.

But, in this case, the assessment of compensatory damages does not stop at mulcting appellant $35,000 for alleged misconduct based on her financial worth or rating but goes still *another step in vengeance and penalizes her in the further sum of* "$15,000 *punitive damages,*" heaping *one presumption upon another.* The latter appears to have been done on the theory that some kind of public policy has been violated by appellant, for which the state has no law to punish; and that, therefore, the injured party may not only recover "*actual* damages" but may also collect any *exemplary* penalty the jury may see fit to assess, *based on the wealth or financial worth of the defendant.* In other words,

the jury has assessed what is designated "actual damages, $35,000", on the basis in part or wholly of appellant's wealth and then proceeded to tack on the modest sum of "$15,000 punitive damages" as a penalty for having been industrious, economical and business-like and refusing to pour a constant stream of money into the hands of her son and his wife.

It seems clear to me that the *conclusion* reached by the majority of this court, in reducing the verdict and judgment from $50,000 to $21,000, is conclusive proof that the majority think the evidence does not support the verdict for any part of the excess of $29,000. That leads to the quaere: Why did the jury return a $50,000 verdict when the evidence only supports or justifies a $21,000 verdict? The answer seems obvious, that there was $29,000 worth of prejudice, bias, passion, or misapprehension of the court's instructions, included in a $50,000 verdict. If the overwhelming majority of the verdict was the result of prejudice, bias or passion, who can say that a jury, freed of such prejudice, bias or passion, would not have accepted and believed the evidence produced by appellant and returned a verdict in her favor?

In considering this aspect of the case, it should be remembered that the majority hold that no error was committed in course of the trial or the giving of instructions; and consequently the jury was not mislead by anything that occurred in course of the trial. If this be correct, as held by the majority, then what caused them to render a verdict 58% wrong (too much) and 42% right? The obvious answer again is: prejudice, bias, or passion. $29,000 worth of prejudice is a good deal for one litigant to suffer in a single case in a forum of justice.

Cases from other states, fixing the amount of damages in alienation cases, are of very little benefit to us here, due to the divergent facts and rules of practice in different states. For instance, in the Washington practice, punitive damages are not allowable. (*Phillips v. Thomas*, 70 Wash. 533, 127 P. 97, Ann Cas. 1914B 800 and note, 42 L.R.A., N.S., 582.) The annotation to the latter case also shows a great number of judgments that have been allowed by different courts in such cases.

As said by Justice Deemer, in *Warren v. Graham*, 174 Iowa 162, 156 N.W. 323, 326: "Precedents are of little value

here, for each action is dependent on its own peculiar facts." See also, *Heisler v. Heisler,* (Iowa) 127 N.W. 823, 826.

In the latter case, the supreme court seems to have considered that the jury misappraised the value of plaintiff's evidence and accordingly remanded the case with instructions to grant a new trial, unless the plaintiff waived all in excess of $5,000, the court saying:

"A man who, instead of resenting unfounded, insinuations against his wife, even when made by his mother, will hie himself to the hay mow to weep, and then abuse her, whom he has promised to protect, is hardly worth quarreling over."

In *Jones v. Jones,* 96 Wash. 172, 164 P. 757, cited by the majority opinion, the jury returned a verdict for $25,000 and motion for new trial was made and granted by the trial court, providing that if the plaintiff elected to accept judgment for $12,500, the verdict might stand for that sum. Plaintiff elected to accept the modified judgment and defendant appealed. The judgment was affirmed.

In *Thompson v. Thompson,* also a Washington case, 6 P. (2d) 617, the judgment was reversed and the cause remanded "with direction to grant the appellant's motion for a new trial unless the respondent, within ten days . . . elects to accept the sum of $2,500, including costs."

The court there quoted from *Phillips v. Thomas,* supra, and said:

". . . a verdict should not be permitted to stand where the facts and circumstances show it to be the *result of passion and prejudice.*" (Italics mine.)

In *Marckwardt v. Hayworth,* 127 Cal. App. 738, 16 P. (2d) 328, decided by the District Court of Appeals of California, a verdict was rendered for $15,000; defendant moved for a new trial. The trial court granted a new trial, providing, however, that the motion would be denied, if the plaintiff filed an acceptance of judgment for $7,500. The court of appeals affirmed the judgment.

Substantially the same practice and procedure was had in the case of *Fitzpatrick v. Clark,* 26 Cal. App. 2d 710, 80 P. (2d) 183, decided by the California Dist. Court of Appeals.

Other cases cited by the majority opinion, in support of reduction of verdict, are substantially to the same effect as above pointed out and afford no precedent to be followed

in this case, especially in the light of our own cases cited, supra.

In view of the whole record, I am satisfied that the verdict is so tainted with prejudice and bias that it should not be allowed to stand. The judgment should be reversed and a new trial ordered. Furthermore, I think there is nothing in this record that justifies punitive damage in any sum.

DUNLAP, J., dissenting.—I conclude, after a careful analysis of the evidence in this case, that it does not justify the verdict in the amount rendered by the jury; that it is so disproportionate to any compensation reasonably warranted by the circumstances and facts as disclosed by the evidence, as to shock the sense of justice and raises a presumption that it is a result of passion and prejudice rather than sober and dispassionate judgment.

While it is probably true that appellant, in her acts and dealings with her son and his wife did not always employ the tact, patience and restraint which respondent, as a bride and new member of the family might reasonably have expected, yet the record does disclose many acts of kindness and generosity of the mother toward the son and his wife; and it must be remembered that many of the dealings between the parties were of a business nature and, as to those matters, the mother was well within her legal rights in keeping them on a purely business basis. Furthermore, it would appear from the record here, that because of her son's inexperience and character, it was only prudent and wise for her to do so.

Moveover, the appellant had the right to interest herself in the marital affairs of her son as the law recognizes a peculiar interest of a parent in the welfare of his child and therefore allows a wide privilege of action on his part in the protection of this interest. (27 Am. Jur., sec. 529, pp. 130-132; 27 Am. Jur., sec. 531, p. 133; anno. 108 A.L.R., 410-413; *Ludlow v. Ludlow*, 100 Colo. 320, 67 P. (2d) 501-503; *Worth v. Worth*, 48 Wyo. 441, 49 P. (2d) 649; *Bradford v. Bradford*, 165 Ore. 297, 107 P. (2d) 106; *Fronk v. Fronk*, 159 Mo. Appl. 543, 141 S.W. 692; *Howard v. Boyle*, 335 Mo. 435, 73 S.W. (2d) 228; *Kurdle v. Brookmeyer*, 172 Md. 246, 191 Atl. 416; Restatement of the Law, Torts, vol. 3, p. 478.)

"The cases place the parent on a different footing from

a stranger, and require that a stronger case of malicious and unjustified interference be shown against the parent than against a stranger, for the parent to be held liable." (Anno. 108 A.L.R., p. 421.)

As suggested by Mr. Justice Ailshie, it appears that respondent was of a suspicious nature; moreover, the record discloses that she was very ready to take offense, become hurt over matters which, to a less sensitive person, would appear to be inconsequential. Her dislike of her mother-in-law is evidenced by her readiness to attribute a design to find fault, humiliate and annoy, when as a matter of fact such motives, rather than being real and apparent, seem more likely to have existed in respondent's imagination.

It would appear in other words, that respondent "wore her feelings on her sleeve." Many of appellant's actions, of which she complained and which covered a period of some time, would, to an unprejudiced mind, seem to be without foundation as the basis of respondent's exception and taking offense.

By reason of the intimacy of family relationships and the difference in the character and temperament of the component members thereof, irritations, and especially over a long time of association, are inevitable. Very seldom, however, are these rightfully attributable to maliciousness or a desire to harm or annoy. They are rather, the result of impatience and petty annoyances to which everyone is subjected.

These instances, grouped together and related in a lawsuit of this nature by one who is himself thoroughly convinced of having suffered injustice, would tend to have an ominous effect, and might very naturally create the impression that they were calculated and intended to injure and be harmful, when as a matter of fact, if viewed separately and with allowances for the difference in the temperaments of the various members of the family, they appear to a dispassionate mind to be very trivial.

This idea has been well emphasized by the Supreme Court of Maine in the case of *McCollister v. McCollister*, 138 Atl. 472, 473, as follows:

"The common disagreements which arise among the members of a family, the frank criticism of each indulged in by the others, words, spoken in haste and in the freedom of confidential family intercourse, taken out of their original

setting, and reproduced in solemn testimony in a courtroom, magnified and distorted by bias, prejudice, and interest, may be made to appear to carry inferences never originally understood or intended."

In *Hughes v. Holman*, 110 Ore. 415, 223 P. 730, 31 A.L.R. 1108, the Oregon court, speaking with reference to suits of this nature, held that such cases should be subjected to the most careful scrutiny, not only by the jurors, but by the appellate court, and especially in cases in which parents are defendants.

The question of malice, its meaning, the extent to which it must be shown, and the burden of proof, have been discussed by my associates in their opinions in this cause, and while from the viewpoint of some, legal malice might be inferred from some of appellant's statements, I cannot conscientiously conclude that it was shown to exist to the tune of $50,000.00, and that the verdict for that amount, under the facts in this case, does not show passion and prejudice.

The majority opinion now finds and holds, the judgment here should be for $21,000.00, which is $29,000.00 less than the award by the verdict of the jury. It appears to me that this is a finding, as a matter of law, that the verdict is the result of passion and prejudice. (*Tunnel Mining & Leasing Co. v. Cooper*, 50 Colo. 390, 115 P. 901, 39 L.R.A., N.S., 1064, Ann Cas. 1912C, 504.)

This court has ruled that the amount of the verdict may show it was a result of passion and prejudice. (*Neil v. Idaho & Washington N. R. R. Co.*, 22 Ida. 74, 125 P. 331.) However, I have concluded, under the facts as disclosed by the whole record in this case, after a full consideration and analysis of the same, that the verdict is so disproportionate to any compensation reasonably warranted as to constitute inherent evidence, that it is the result of prejudice, partiality, passion, or some undue or improper influence or cause.

This is obviously also conceded by the majority because of its astoundingly large reduction in the verdict.

To permit any part of the judgment to stand is inconsistent with the preservation of impartiality, integrity and purity of the trial by jury.

The judgment should be set aside in its entirety, and a new trial granted.

In the case of *Luther v. First Bank of Troy*, (Ida.) 133 P. (2d) 717, Mr. Justice Givens announced the rule, which

I think this court should apply in this case, and which is stated in the opinion here of Mr. Justice Budge.

Exception to the verdict on the ground of its excessiveness, influenced by passion and prejudice, does not appear to have been made to the learned trial judge, who probably would have been in a better position to pass upon the matter than we; nevertheless, it is apparent under the decisions of this court, and cited by Mr. Justice Givens, in the case immediately above referred to, that the question is properly presented to us for consideration in the first instance.

I concur with Mr. Justice Ailshie in his conclusion, that the judgment should be reversed and a new trial granted.